## THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* SCHAUB BROTHERS.

*Right of Seller to Rescind Contract Upon Failure of Buyer to Pay For First Deliveries According to Agreement—Contract For Sale of Coal to be Analyzed by Buyer's Agent—Failure of Agent to Make Analysis—Stipulations as to Time of Payment of the Essence—Provisions for Referring Disputes to Third Party—Whether Breach of Contract Authorizes Rescission a Question of Law.*

When a contract for the sale of goods to be delivered during several months provides that payment for the goods delivered during each month shall be made in the succeeding month, after an inspection by an agent of the buyer, then if payment for goods delivered during a month has been refused by the buyer the next month because his agent had neglected to inspect the goods and certify as to their quality, that in such a breach of the contract as justifies the seller in rescinding it at

the end of the second month, and in refusing to make further deliveries, and in an action by him to recover the price of the goods delivered the buyer is not entitled to recoup damages arising from the non-delivery of the subsequent instalments.

A stipulation is a contract that a designated person is to interpret the terms and conditions of the agreement and that in the event of any dispute as to the meaning of any of the provisions, the decision of that person is to be final, does not require the parties to submit to him the question whether there has been such a breach of the contract by one party as authorizes the other to rescind.

The question whether a party was entitled to rescind a contract on account of the non-performance of a term therein by the other party is a question of law for the Court and not of fact for the jury.

Plaintiffs, dealers in coal, contracted in June to supply the defendant, the municipality of Baltimore, with a certain quantity of coal for the use of the School Board, of which two-thirds was to be delivered during July and August, and the other third as needed. The contract provided that payments should be made once a month for all the coal delivered by the contractor during the previous month and should be made on a basis of what the coal shows on analysis; also that the City Chemist should at the end of each month make an analysis of the coal delivered and send it to the department for which the coal was furnished and the department will then adjust the contractor's bill according to the analysis. The contract further provided that "the Water Engineer is to interpret the terms and conditions of this agreement, and in the event of any dispute as to the meaning of any of the provisions of the same the decision of the Water Engineer is to be final." Plaintiffs made deliveries of coal in July and August. The coal delivered in July was not paid for in August and in answer to plaintiffs' frequent demands for payment, defendants' agents said that they could not make payment because the City Chemist had made no analysis of the coal, and the City Chemist informed the plaintiffs that he could not make the kind of analysis required by the School Board until the end of the year. The coal delivered in August was also not paid for and on September 3rd, the plaintiffs notified the defendant that they rescinded the contract for non-payment and would make no further deliveries. On September 6th the City Chemist furnished an analysis. In an action by plaintiffs to recover for the coal so delivered the defendant claimed the right to recoup as damages the increased cost of the coal which it bought from other parties in place of that which plaintiffs had refused to supply. *Held*,

1st. That the stipulation as to the time of payment was of the essence of the contract and that since the defendant broke the contract by not paying for the coal delivered in July at any time during August, the plaintiffs were entitled to rescind and maintain this action, and that the defendant is not entitled to recoup the damages arising from its own breach of the contract.

2nd. That the analysis of the coal by the City Chemist was not an abso-
lute condition precedent to the defendants' liability to pay and if the
chemist failed to make the analysis within the prescribed time, the
plaintiffs were authorized to rescind without showing that the delay was
made for the purpose of delaying payment, because the purpose of the
delay was immaterial in this case.

3rd. That the provisions in the contract for referring to the Water Engi-
neer disputes between the parties as to the meaning of the agreement
did not require the plaintiffs to submit to him the question whether or
not the defendant was in default on September 1st by reason of non-
payment for the July deliveries.

Appeal from Baltimore City Court (DENNIS, J.)

*Plaintiffs' Prayer.*—The plaintiffs pray the Court to rule,
that if the Court sitting as a jury shall find from all the evi-
dence that the plaintiffs and the defendant corporation entered
into the contract dated June 18th, 1901, offered in evidence in
this case, and that the plaintiffs furnished thereunder to the
School Board, one of the city departments named therein, coal
as directed and required by said board or its agent, and de-
livered said coal to several of the public schools of Baltimore
City during the months of July and August, 1901, and that
the plaintiffs on or about August 1st, 1901, presented their
bill for the coal furnished and delivered during said month of
July to said School Board or its agent and were informed that
said bill would be paid as soon as analyses of the coal were
received from the City Chemist, and that they continued to
furnish said board with coal for the schools of said city during
the month of August, 1901, and that upon inquiry of the City
Chemist during said month of August the plaintiffs were told
and informed that said analysis could not be made and fur-
nished to the School Board for a considerable time, and that
only one analysis would be made for each district, and then
only after all coal for that district, was furnished, and if the
Court shall further find that no analysis were made until Sep-
tember 6th, 1901, and were then furnished to said School
Board, and this delay in making analysis was owing to some
misunderstanding on the part of the City Chemist as to how
the said coal was to be analyzed, and that the defendant cor-
poration wholly failed and neglected to pay the plaintiffs for

the coal by them furnished and delivered to the said School Board during the month of July, 1901, at any time in the month of August, 1901, and up to.and until September 3rd, 1901, and that on said day September 3rd, 1901, the plaintiffs notified the defendant by letter of that date addressed to the Board of School Commissioners and offered in evidence in this case, that they would furnish no more coal to the School, Board, that then, if the Court finds all these facts and that if the City Chemist did not make the analysis of the coal furnished to the School Board during the month of July, 1901, until September 6th, 1901, its verdict must be for the plaintiffs for the amount of coal bills for the months of July and August, yet remaining due and unpaid to the plaintiffs by the defendant, together with interest in the discretion of the Court, on the amount so found to be due and unpaid, from October 1st, 1901.   (*Granted.*)

*Defendants' 1st Prayer.*—That according to the terms of the contract between the plaintiffs and the defendant, offered and read in evidence, it was the duty of the plaintiffs, if they felt aggrieved by the delay in the payment upon the part of the defendant, to have submitted that grievance to the Water Engineer for the purpose of ascertaining whether or not under the terms of the contract, the plaintiffs were required to wait for payment until the analysis, as prescribed by the terms of the contract had been made by the City Chemist; and that until this action was taken and the construction of the Water Engineer given to the contract, the plaintiffs did not have the right to refuse further compliance with the terms of said contract, as to the delivery of coal, and such refusal upon their part constituted a breach of the contract by them, and whatever loss accrued to the defendant by virtue of said breach of contract, the defendant is entitled to have set off against the claim of the plaintiffs for coal furnished under said contract.

Refused, because there is no evidence to show there was any " dispute," within the meaning of the contract, as to the meaning of any of the " provisions and clauses " thereof.

*Defendants' 2nd Prayer.*—That according to the terms of

the contract between the plaintiffs and the defendant, offered and read in evidence, the analysis of the coal furnished by the plaintiffs to the defendant under said contract, was a condition precedent to the obligation upon the part of the defendant to pay the plaintiffs for coal actually furnished and it was the duty of the plaintiffs to show that the defendant negligently delayed furnishing the analysis, with the purpose of delaying payment for coal delivered by the plaintiffs ; and if the defendant did not so negligently delay said analysis, nothwithstanding the fact there was a lapse of a few days after the July payment, under the terms of said contract, as claimed by them, was properly payable ; and if it further appears that the plaintiffs on the third day of September, 1901, being three days after the July payment was due, even if the analysis had been furnished, broke said contract by refusing to deliver further coal under the terms thereof to the Board of School Commissioners, then the defendant is entitled to have set off all loss and injury which resulted to the defendant by the breach of said contract.

Refused, because it is not incumbent upon the plaintiffs to show that the defendant negligently delayed furnishing the analysis, "with the purpose of delaying payment for the coal delivered by plaintiff." The purpose is immaterial, if the defendant failed to comply with the terms of the contract.

*Defendants' 3rd Prayer.*—If the Court, sitting as a jury, finds from the evidence that the defendant exercised due diligence in its efforts to have the analysis of the coal, which was agreed to be delivered by the plaintiffs to the defendant, under the terms of the contract read and offered in evidence, and that while there was a delay of seven days from the time that the July delivery of said coal was claimed to be payable by the plaintiffs, the defendant, after the receipt of the plaintiffs' letter under date of September 3rd, 1901, notified the plaintiffs on the seventh day of September, 1901, that the analysis had been furnished and that the defendant was ready and willing to pay for the July and August deliveries of coal, if the plaintiffs were willing to carry out the terms of their con-

tract, and if the Court, sitting as a jury, further finds that not-withstanding this offer upon the part of the defendant or its agents, the plaintiffs refused and neglected to carry out and perform the provisions and requirements of said contract, then in that event the defendant is entitled to a set off against the plaintiffs' claim to an amount equal to the loss incurred by the defendant by virtue of the breach of said contract, to which the defendant was put in being required to obtain coal for its purposes to be used in the public schools of said city, as a result of said breach of said contract.

Refused, because there can be no question raised as to "due diligence," when the contract calls for a specific period within which the analysis must be ; and upon the further ground that there is no evidence of "due diligence."

*Defendants' 4th Prayer.*—If the Court, sitting as a jury, finds from the evidence that the contract made and entered into between the plaintiffs and the defendant, for the delivery of coal to the Board of School Commissioners contained, among other things, a provision that in the event of any dispute be-tween the parties the same should be submitted to the Water Engineer for interpretation ; and if the Court further finds that no question as to the interpretation of said contract, as to the time and conditions of payments by the defendant, was sub-mitted to the said Water Engineer, and that, without having him, the said Water Engineer, interpret said contract, the plain-tiffs refused on the 3rd day of September, 1901, to deliver any more coal under its said contract to the Board of School Com-missioners, then said refusal upon the part of said plaintiffs, without having first complied with the requirements of said contract by submission thereto to the Water Engineer for his interpretation as to the rights of the respective parties thereto, was a breach of said contract upon the part of the plaintiffs, and the defendant is entitled to have allowed it, as a set off, the difference between the price which the said defendant was to have paid the plaintiffs under the terms of the said contract for coal, and the price which was actually paid by said defend-ant to other parties after the breach of said contract upon the

part of said plaintiffs, including also the difference in price
under the new award subsequently made by the defendant;
and also the said defendant is further entitled to be allowed by
way of set off all costs incurred in re-advertising for new bids
after the breach of said contract.   And if the Court further
finds that said loss to which said defendant is entitled amounts
to the difference between the account filed upon the part of the
plaintiffs and the amount paid under confession of judgment
under the pleas filed in this case, then in that event the ver-
dict must be for the defendant.

Refused, for the reasons stated in refusing the defendants'
first prayer.

*Defendants' 5th Prayer.*—The burden of proof is upon the
plaintiffs to establish by a preponderance of evidence that the
defendant failed to perform its contract, and that said failure
was sufficient to rescind the contract, as to the obligations
which were by the contract enjoined upon the plaintiffs.

Refused, because it submits to the jury a question of law,
viz: whether the failure of defendant to perform its contract
was sufficient to justify the plaintiffs in rescinding the contract
on his part.

The cause was argued before McSHERRY, C. J., FOWLER,
PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Olin Bryan* (with whom was *Wm. Pinkney Whyte* on the
brief), for the appellant.

There are two questions decisive of the rights of the respec-
tive parties:  First.  Whether or not that provision of the con-
tract which requires an analysis upon the part of the City
Chemist is a *condition precedent* to payment; and if so, whether
there could be default in payment upon the part of the city
prior to the analysis having been made unless it were manifest
that the delay upon the part of the City Chemist was attribu-
table to collusion by the city or fraud upon its part?

Second.  Whether or not, under the provisions of said con-
tract, the duty of Schaub Brothers to submit to the Water

Engineer the question as to whether or not the city was in default by not making payment on the first day of September, 1901, for the coal delivered in the month of July, 1901, notwithstanding the fact the City Chemist had not submitted his analysis thereof?

There is no escaping the conclusion that when provision is made in a contract for inspection and approval of certain goods by some one designated, that this is a *condition precedent* to the acceptance of said goods, and there can be no recovery until these express provisions of the contract have been fully and completely complied with. *Lynn* v. *B. & O. R. R. Co.*, 60 Md. 411; *Gill* v. *Vogeler*, 52 Md. 663.

The money for the July payment was not due and payable until the 6th day of September, when the City Chemist reported his analysis to the School Board. We not only, however, were willing to pay for the July delivery at this time, when the condition precedent had been complied with and the report of the chemist made, but we were willing also to pay for the August delivery, which was not due until 24 days later, showing perfectly that there was no disposition upon the part of the city to delay payment or take any advantage of Schaub Brothers by undue and unnecessary delay. Upon the contrary, there is in this case nothing to show that there was any disposition upon the part of the city to hold back the money which was due on the contract, or to delay the same in any sense. The only thing that was desired was the protection, to which the city was entitled, to which Schaub Brothers had agreed, and that was to, have the analysis made before the payment was made, so that payment would be made on a correct basis; and it could not be made without the analysis, except upon an uncertain basis, for the analysis, when it was made, disclosed a marked discrepancy as to the amount which was actually due by the city and proves conclusively that had the city paid upon the theory of Schaub Brothers, without having the analysis as a basis for such payment, the city would have paid more money that it ought to have paid, and this was the very thing, in fact, we can say,

the controlling idea, which caused that provision to be put in the contract; that payments were not to be made until the analysis had been actually made.

The figures as shown by the record, disclose that while Schaub Brothers claimed that there was due $11,212.53, there was actually due by the report of the chemist only $10,990.05, making a difference in the city's favor of $222.48.

It requires no further comment to demonstrate, it seems to us, that the only reason that the provision for the chemical analysis was placed in the contract, was to guard against such a condition, and how could it be effectual for that purpose, unless it was made a condition precedent to the payment itself?

There is another thing that should be noticed in reference to this contract, and that is, that the City Chemist while, in a sense, a city official, was made the arbitrator as between the city and Schaub Brothers, for the purpose of determining the amount of money which should be paid for the coal delivered. In other words, his analysis, was to determine the rights of the city and of Schaub Brothers as to the amount of money which Schaub Brothers was to receive from the city, and he was, therefore, acting in the capacity of the agent for them, having been thus selected and designated and clothed with the authority for this specific purpose.

Where a party desires to rescind his contract, the right to rescind does not exist unless the conduct of the other party to the contract, that is, the party in default, be such as to evince an intention to abandon the contract or a design no longer to be bound by its terms. "The rule is, that defaults by one party in making particular payments or deliveries will not release the other party from his duty to make other deliveries or payments stipulated in the contract, unless the conduct of the party in default be such as to evince an intention to abandon the contract or a design no longer to be bound by its terms." *Blackburn* v. *Reilly*, 47 N. J. L. 290, 308. If one party to a contract intends to rescind it, on the ground of failure of performance by the other, a clear notice of such intention must be given, unless the contract either dispenses

with notice, or it becomes unnecessary by reason of the conduct of the parties. *Hennessey* v. *Bacon*, 137 U. S. 78; *Scott* v. *Kittaning Co.*, 89 Pa. St. 231.

The report of the City Chemist was a condition precedent to payment. When a contract with the United States for building a wall provides that payment for the work contracted for shall not be made until an agent, to be designated by the United States, certifies that it is in all respects as contracted for, and after completion of work the designated agent refuses to give the certificate, and there is no fraud, nor such gross mistakes as would necessarily imply bad faith, nor failure to exercise honest judgment on the part of the agent, the engineer's certificate is a condition precedent to payment. *Sweeney* v. *United States*, 109 U. S. 618. The provision in a contract for railroad grading that the measurements and calculations by the railroad company's chief engineer of the quantity and amount of the several kinds of work and his classifications of the materials contained in excavation, shall be final and conclusive, is a valid provision, and is binding upon the parties to the agreement, and there can be no recovery in excess of his final estimate, in the absence of fraud, gross error, or mistake. *Lewis* v. *Chicago S. F. & C. Ry. Co.*, 49 Fed. 708; see also, *Martinsburg & Potomac R. R. Co.* v. *March*, 114 U. S. 552; *Lawson, &c.*, v. *Prudential Ins. Co.*, 171 Mass. 433, 434.

When a day is appointed for the payment of money, &c., and the day is to happen after the thing, which is consideration for the money, &c., is to be performed, no action can be maintained for the money, &c., before performance. *Tharp* v. *Tharp*, 12 Md. 460; *Bean* v. *Atwater*, 4 Conn. 9; *Dey* v. *Dox*, 9 Wend. 129.

Mutual contracts sometimes contain a condition, the breach of which by one party permits the other to throw the contract up, and consider it as altogether null. Whether a provision shall have this effect, for which purpose it must be construed as an absolute consideration is sometimes a question of extreme difficulty. It is quite certain, however, that no precise

words are now requisite to constitute a condition ; and perhaps no formal words will constitute a condition, if it be obvious from the whole instrument, that this was not the intention or understanding of the parties.   It would be difficult and perhaps impossible, to lay down rules which would have decisive influence in determining this vexed question.   Indeed Courts seem to agree of late that the decision must always depend upon the intention of the parties, to be collected in each particular case from the terms of the agreement itself and from the subject-matter to which it relates.   It is said that where the clause in question goes to the whole of the consideration, it shall be read as a condition.   *Parsons on Contracts* (8th ed.), vol. 2, pp. 643-4 ; see *Lynn* v. *B. & O.*, 60 Md. 404.

In reference to the provision of the contract requiring disputed questions to be interpreted by the Water Engineer, we cite *Chicago, &c., Co.* v. *Price*, 138 U. S. 193.

*John Prentiss Poe* (with whom was *Frederick C. Cook*, on the brief), for the appellees.

In the lower Court great emphasis was put upon the phrase that the monthly payments would be made *on the basis of what the coal shows on analysis*, and, therefrom, it was argued that the failure of the city's chemist to make the analysis in time to allow the monthly payments to be made, as provided for in the contract, enlarged the time of payment until such analysis was furnished.

In commercial contracts, even though not made so by express stipulation, *time* is usually held to be of the essence of the contract, whether it be a term of the description of the article sold, as in *Bowes* v. *Shand*, 2 App. Cas. 455, or a condition of payment as in *Withers* v. *Reynolds*, 2 B. & Ad. 882.

The obvious reason of thus construing time to be of the essence of the contract among commercial men, is because "merchants are not in the habit of placing upon their contracts stipulations to which they do not attach some value and importance." (2 *App. cases*, 463.)   They may desire to know when to provide for payments to be made by them, and when

they may expect payments to be made to them, so that they may conduct their business successfully and with a due regard to their own responsibilities.

The doctrine of *Bowes* v. *Shand, supra,* has been followed and approved in this State. *Salmon* v. *Boykin,* 66 Md. 547-550. And that of *Withers* v. *Reynolds, supra,* has also been followed and approved. *Curtis* v. *Gibney,* 59 Md. 155; *Mc-Grath* v. *Gegner,* 77 Md. 336.

The appellant contends that the analysis was to be the *basis* upon which the amount due was to be calculated. The analysis was to be made so that the premiums or deductions to be added to or taken from the contract prices, as the quality of the coal furnished was shown by the analysis to excel or fall below the quality required by the contract, and also to ascertain the city's right to reject coal of inferior quality to that called for in the contract, and for no other purpose.

It is plainly inferrible that the analysis should be finished in time to ascertain what payment should be made during the ensuing month, for it is expressly provided in the specifications "if the analysis shows that the shipments of coal made by any contractor during the month do not come within these specifications * * * then when the next shipment, made by the contractor, of the same class of coal is received an analysis will be made of a sample of the coal *at once,* and if that analysis shows that the coal does not come within these specifications, that shipment will be rejected and must be removed at the contractor's expense."

This contemplates an early monthly analysis and not the hardship of imposing on the contractor the delivery of coal for an entire succeeding month and its subsequent rejection and removal. It looks to the removal of the *next shipment* of the same inferior coal, and was never intended to allow the city any extension of credit beyond the specific terms in the contract.

The appellees had no control of the City Chemist, who is an employee of the city; the city had, and could easily have seen to it that the analysis was made in time to meet its obli-

gation at the time agreed upon. It must be held to have taken all this into consideration when it made the contract with the appellees and fixed its own terms of payment in its specifications, on which the plaintiffs' bid was made and which are incorporated in the contract, and it should not be allowed to take advantage of its own neglect or the negligence of any of its employees in connection with the analysis, in order to enlarge the time of payment called for in its contract, prepared by and approved by its own officials.

In *Savannah Ice Co.* v. *Am. Transit Co.*, 110 Ga. 145, the plaintiff sued for a breach of the contract, and the fact of non-payment for ice, delivered in May, until some time in July was established by the evidence, which showed that the bill for the ice furnished in May was sent to the plaintiff's agent at Atlanta on May 3, but that it did not reach the hands of its purchasing agent until the day when it was paid, July 9th. The defendant Ice Co. refused to file an order given on July 16th, and the Court says of the attempted explanation of the delay in payment: "It is plain, therefore, that the excuse set up for the failure to pay amounts in contemplation of law, to no excuse at all."

PEARCE, J., delivered the opinion of the Court.

On June 18th, 1901, the plaintiffs, dealers in coal, entered into a written agreement with the defendant to supply certain departments of the City Government, including the School Board, with coal up to April 15th, 1902, to be delivered at such times, and in such manner as provided in specifications forming part of the agreement. This contract has been complied with by both parties except as to the coal required for the School Board. The approximate quantity required for the School Board, as stated in the blue print attached to the specifications, was 6290 tons, of which two-thirds was to be delivered during July and August, and one-third as needed; but the School Board reserved the right to order less than the estimated quantity, if less was needed.

The plaintiffs made the first delivery July 16th, 1901, and

continued to make deliveries up to August 29th, 1901, aggregating 2101 tons, when they refused to make further deliveries, alleging that the defendant had broken the contract by failing to make payment as provided, and had thereby discharged the plaintiffs from further liability under the contract, and this suit was brought October 28th, 1901, to recover for the coal delivered amounting to $11;062.35. The defendant admitted the correctness of the statement of coal delivered, and that it was indebted to the plaintiffs in the sum of $5,326.42, but filed a plea of set off alleging that the plaintiffs had broken the contract by refusing to make further deliveries, and that they were indebted to defendant in the sum of $5,735.93 "for actual damage caused by the failure of the plaintiffs to fulfill and carry out said contract, as shown by the statement attached to this plea, and prayed to be taken as a part thereof." Issues were properly joined on the pleadings, and the case went to trial before JUDGE DENNIS sitting as a jury. The amount admitted to be due was paid before the actual trial, and a verdict was rendered for the plaintiffs for $6,175.46, being the full amount claimed after deducting the payment made. The only exception taken was to the rulings upon the prayers, and the only question thus presented is whether the defendant is entitled to the set off claimed.

The provisions of the contract material to the consideration of the case are as follows :

*Payments.* "Payments will be made *once a month* by each department for all the coal delivered to that department by the contractor during the previous month, and will be made on the basis of what the coal shows on analysis." Provision is made for taking samples of coal for analysis from each shipment made to any department during the month. "At the end of the month all the samples thus accumulated will be thoroughly mixed, and a quart preserving jar will be filled with the mixture, labelled and sent to the City Chemist. The City Chemist will, at the end of each month, thoroughly mix the contents of all these jars, and from that mixture take three quart jars for analysis, and will send to each department the

result of his analysis of any one of these three jars, and the department will then adjust the contractors bill, adding or deducting a given percentage of gain or loss upon given percentages of ash shown in the coal."

*Rejections.* "If the analysis shows that the shipments of coal made by any contractor during the month, do not come within the specifications, * * * then when the next shipment made by the contractor, of the same class of coal is received, an analysis will be made of a sample of this coal at once, and if that analysis shows that the coal does not come within the specifications, that shipment will be rejected, and must be removed at once at the contractor's expense."

*Water Engineer to interpret contract.* "The contractors agree that the Water Engineer is to interpret the terms and conditions of this agreement, and the specifications accompanying; and in event of any dispute as to the meaning of any of the provisions and clauses of same, the decision of the Water Engineer is to be final."

The testimony in the case may be summarized thus :

Lewis W. Schaub, one of the plaintiffs, testified that after the first month's delivery, he took a statement to Mr. Owens, Supervisor of School Buildings, who had the matter in charge, and who went over the bill with him and corrected it; that he told Mr. Owens he would like to have the money, as the contract was taken at a low figure, and they needed the money, and that Mr. Owens told him they should have it as soon as possible. That they continued delivering through August, and that during that month he went to Mr. Owens more than once, and told him they must have the money, as their shippers had made an agreement with them according to their own specifications with the defendant, and if they did not pay the shippers accordingly, they would not ship any more coal. That they went again to urge payment, and were told the analysis had not been sent in, and that he replied, "you have to look out for that yourself; we have only to deliver the coal." That they went again in September and were told there was nothing for them, and that he then went to see the shippers who replied,

" we can't put up with that we must have money ;" where-
upon on September 3rd, they sent to the School Board the
letter of that date set out in the evidence, stating that both Mr.
Owens and Mr. McGill had told them they were unable to pay
them—because no analysis had been received from the City
Chemist, and that they would not be paid until such analysis
was received, also stating that they had called on Prof. Lehman,
the City Chemist, in reference to the matter, and that he told
them that with an extra force, he could not furnish the analy-
sis required by the School Board by Christmas ; that it was
apparent the defendant was unable to keep its part of the agree-
ment, and having failed to do so, they must refuse to ship it
any more coal.    This witness further testified that he told Mr.
Quick, the Water Engineer, that they had trouble about the
payment and needed money, and that he said they would do
the best they could, but could not say he asked Mr. Quick
whether they had to wait for payment until an analysis was
made ; also that his brother, Francis J. Schaub, was with him
when he talked with Mr. Quick, and that his brother did most
of the talking at that time.    Francis J. Schaub testifying for
the plaintiffs, said he was a member of the bar, and attorney
for the plaintiffs, and confirmed Lewis W. Schaub in detail.
He said the plaintiffs understood that defendant had the month
of August to make the analysis for July, and they so told Mr.
Owens, when they presented the July bill, but asked him to
hurry Prof. Lehman up, and he said he would ; also that he
went to see Prof. Lehman who said he would do the best he
could, but that the way the School Board wanted the analysis
he could not get them through by Christmas even with six
assistants ; also that he had seen Mr. Quick and asked him if
he could not hurry it up, and he said he had nothing to do
with it ; that after the letter of September 3rd, there was a
meeting at the Mayor's office when Mr. Quick and Mr. Owens
were present, and Mayor Hayes, and an effort was made to
arrange for delivering the residue of the coal under the con-
tract, and he agreed to this for the plaintiffs if defendant would
take the coal by the manifest weight, and Mayor Hayes thought

this was reasonable, but Mr. Owens thought this would not be just to the other dealers, and no agreement was reached. He also said that Mr. Owens phoned him after this interview to ship the coal, and he went to see Gov. Whyte about it, and Gov. Whyte said, " get an order in writing before delivering any more coal. If you ship that coal on Mr. Owens say so it will get you in trouble ; " that Mr. Owens at his request, on the 7th of September, phoned him the analysis, but said nothing about payment, and that if he had, they would have been glad to accept it.

Prof. Lehman who also testified for the plaintiffs, confirmed the testimony of the two Schaubs. He says that he furnished no analysis to the School Board until September 6th ; that he was called sometime in September to the Mayor's office, by the Mayor himself, to explain why there was delay in the coal analysis, and subsequently on the same day, received instructions how to furnish the analysis to the School Board, and they were then furnished to Mr. Owens on September 6th, but before that, he was not informed that analysis in detail were not required, and understood that a separate analysis was required from every school ; that before receiving the instructions in September he did tell the plaintiffs he could not furnish the analysis with the force at his command, before Christmas, but after receiving Mr. Owens' instructions on the day of the meeting at the Mayor's office he could easily furnish them in the required time of one month ; that he was not furnished with a copy of this contract until after September 6th, and only received a lot of samples without any directions as to how they were to be treated, and that he wrote Mr. Schaub August 2nd, 1901, no analysis would be made until all the coal from one district was furnished, and then it would be for all the business of that district. He said on cross-examination that he was never directed to analyze the July coal without waiting for the August coal, though the plaintiffs told him they were depending upon the analysis for their payment, and were anxious to have the analysis made before August 31st, as they feared trouble with their shippers if they did nòt

receive payment from the School Board. Robert L. Windsor, a clerk for Lynah & Read, from whom plaintiffs purchased their coal, testified for plaintiffs, that the specifications furnished by the defendant with the contract in this case were shown to Lynah & Read, and were the basis of their contract with plaintiffs as to payments; that is, all coal was to be settled for in the month succeeding that in which it was shipped. This closed plaintiff's case, and Benjamin B. Owens was the first witness for defendant.

His testimony did not materially contradict any of the plaintiff's testimony. He admitted that about August 1st the plaintiffs brought in the bill for July deliveries which was adjusted, and he told them that as soon as he got the analysis the bill would be paid; that they continued delivering through August, and frequently urged payment for July, and his reply always was that as soon as the analysis was received, payment would be made; that after August 29th, they stopped deliveries without telling why, and that they had not yet told why, though he admitted receipt from the School Board of plaintiffs' letter of September 3rd. He also said that the plaintiffs had only delivered about 2,000 out of 6,000 tons, though the contract required the delivery of two-thirds during July and August, but he admitted the correctness of plaintiff's statement, that as no coal was ordered until July 16th, they were given until September 16th to furnish the two-thirds, as an offset to the two weeks in July. He also admitted that he gave no instructions to Prof. Lehman as to the method of analysis prior to the meeting in the Mayor's office, and added that he had never since given any such instructions, and that Prof. Lehman was mistaken in his testimony on this point. He also proved the purchase of coal from other parties for the School Board after plaintiffs ceased delivering, and that the increased cost was the amount claimed by way of a set off.

Alfred M. Quick for defendant then testified that he was the Water Engineer, that the plaintiffs did complain to him of inconvenience to them by the delay in the analysis, but that they did not apply to him for any interpretation of the con-

tract.    Upon this testimony the prayers were offered which
will be set out by the Reporter in the statement of the case.

The contention of the plaintiffs is that the monthly payments
provided for, were meant and understood by the parties to be
of the essence of the contract, and, the defendant having failed
to fulfill this stipulation, that the plaintiff had a right to put an
end to the contract.    The contention of the defendant is, that
the analysis of the City Chemist is an absolute condition pre-
cedent to payment, and that the failure of the chemist to make
the analysis within the time limited for payment, enlarged the
time for payment ; and also that the question whether the city
was in default by reason of non-payment by September 1st, for
the July deliveries, was a question to be submitted to and de-
termined by the City Engineer ; and consequently that the
plaintiffs had no right to put an end to the contract, and de-
fendant was entitled to set off damages arising from its breach.

We are of opinion that the contention of the plaintiffs is
correct, and that neither position of the defendant can be main-
tained.    We cannot distinguish this case from that of *McGrath*
v. *Gegner*, 77 Md. 331, which we regard as conclusive of this
controversy.    There the plaintiffs agreed to buy of the defend-
ant all the oyster shells made during the season, and to pay
on the first day of each week for the shells delivered during
the previous week.    After the delivery of a large quantity, the
defendant notified the plaintiff that the contract was at an end,
on account of his failure to make the weekly payments, and
refused to deliver any more shells.    JUDGE ROBINSON, speak-
ing for the full Bench, said : " We cannot suppose for a mo-
ment that the defendant meant to give an indefinite credit to
the plaintiff, nor even a credit until all the shells were deliv-
ered or taken away.    On the contrary, looking to the terms
of the contract, it seems to us it was the intention of the par-
ties that the weekly payments by the plaintiff should consti-
tute an essential part of the contract.    In other words, it was
of the essence of the contract.    In *Withers* v. *Reynolds*, 2 Barn.
& Adol. 882, where the defendant agreed to supply the plain-
tiff with straw to be delivered on plaintiffs' premises, at the

rate of three loads in·a fortnight, during a specified time, and the plaintiff agreed to pay thirty shillings for each load so delivered, it was held that according to the true construction of the contract, each load was to be paid for on delivery, and that on the plaintiffs' refusal to pay for the straw as delivered, the defendant was not bound to deliver any more.     And in *Curtis* v. *Gibney*, 59 Md. 131, treating the contract as an agreement on the part of the defendant to consign 10,000 bushels of barley to the plaintiffs, the shipments to be made at different times, and payment to be made on receipt of each shipment, BARTOL, C. J., said : ' It is equally clear that, upon his failure to remit to the appellant the proceeds in his hands arising from the sale of the barley according to the terms of the contract with the appellant, the latter was not bound to make further consignments to him.' "

In the case before us, a careful examination of the contract, we think will leave no question as to the intention of the parties, and their conduct will confirm the construction placed upon the contract.     It is not reasonable to suppose. that the plaintiffs would enter into a contract, the fulfillment of which on their part, would require the use of so large an amount of money without some corresponding obligation on the part of the defendant to reimburse them during the progress of the fulfillment.     In order to provide for payments to be made by them, it was essential that they should know when they could demand payments to be made to them, and accordingly, the proof shows that they bound themselves to pay their shippers, Lynah & Read, in the same manner that the city was bound to them.     It is thus made clear that they attached importance and value to this stipulation for time of payment, as observed in *Bowes* v. *Shand*, 2 Appeal cases, 455.

Again, we think it is plain that the parties contemplated an *early* monthly analysis, in order to prevent the hardship upon the plaintiffs of full delivery for a succeeding month, with the possibility of its rejection and consequent removal at their expense, for it is expressly provided that if the analysis for any month shows that the coal does not conform to the speci-

fications, that when the *next shipment* is received, an analysis will be made *at once*, and if that analysis shows the coal does not conform to the specifications, that shipment will be rejected and must be removed at the contractor's expense. For these, and other reasons of like character, we do not think the analysis can be regarded as an absolute condition precedent to payment, and we find nothing in the cases of *Gill and McMahon* v. *Vogeler*, 52 Md. 663, and *Lynn* v. *B. & O. R. R.*, 60 Md. 411, in conflict with our conclusion, the distinction between both those cases and the present, being obvious when examined. Nor do we think that the question whether the city was in default by reason of non-payment for the July deliveries by September 1st, constituted any "dispute," within the meaning of the contract, as to the "meaning of any of the provisions or clauses of the same." Questions as to the size, kind or quality of the coal delivered, as to the points of delivery, the correctness of weights or analysis, or other kindred questions, would seem to be within the scope of this provision, but not the ultimate legal right of the parties to the enforcement, or the termination of the contract.

It follows from what we have said, that the plaintiffs' first prayer which embraces and clearly states all the facts necessary to warrant a verdict in their favor upon the principle announced and adopted in *McGrath* v. *Gegner*, was correctly granted, and that the defendants' first and fourth prayers, which required the liability of defendant to be submitted to the Water Engineer, were properly rejected.

Defendants' second prayer was properly rejected, because it declared analysis of the coal to be a condition precedent to payment, and also because it made plaintiffs right to recover depend upon the finding that the analysis was delayed for the purpose of delaying payment, whereas the failure to make analysis within the prescribed time was sufficient, without regard to the reason of the failure.

In like manner, defendants' third prayer was properly rejected, because the contract in prescribing a specific period for making analysis, excludes any question of due diligence.

The fifth prayer of defendant was defective in submitting to the Court sitting as a jury the question whether the defendants failure to perform its contract, if found as a fact, was sufficient in law to justify the plaintiffs in rescinding the contract on their part.

Finding no error in the rulings of the learned Judge, the judgment will be affirmed.

*Judgment affirmed with costs above and below.*

(Decided February 11th, 1903.)

JONES, J., dissented and delivered the following opinion :

I respectfully dissent from the views of the majority of the Court upon a vital point in this case, and will briefly state my reasons therefor. The facts and the evidence in the case are sufficiently stated in the majority opinion to make it unnecessary to do more here than to refer to such part of the evidence as will make intelligible the grounds of my dissent. The pleadings in the case put in issue the right of the appellant to recoup from the claim of the appellees, in suit, damages sustained by the appellant by reason of the refusal of the appellees to carry out the contract which the appellees offered in evidence as the basis of suit.

The only ruling of the Court below which the record brings up for review is that upon the prayers submitted by the respective parties. The prayer which was offered by the appellees and granted by the Court asserted the proposition that if the Court (which was sitting as a jury) should find that this contract was entered into between the parties to the suit, and the other facts therein set out and should then further find that "the City Chemist did not make the analysis of the coal furnished to the School Board during the month of July, 1901, until September 6th, 1901, its verdict must be for the plaintiffs (appellees) for the amount of coal bills for the months of July and August yet remaining due and unpaid to the plaintiffs by the defendant, together with interest in the discretion of the Court on the amount so found to be due and unpaid from October 1st, 1901."

The nature of the evidence offered by the appellees under the pleadings and this instruction based thereon, in effect make this case a suit upon the contract by the appellees in which they are not confined to a recovery of such damages as they might be able to show they had sustained from a breach of the contract without fault on their part; but are enabled to treat the contract as not existing, as respects the appellant and its rights thereunder; and to secure to themselves all the fruits thereof, as far as it had been performed, without requiring them to show that they had performed or were ready, able and willing to perform the contract in its several requirements on their part. This ignores important evidence in the case affecting the rights and obligations of the parties to the contract. The gravamen of the instruction granted at the instance of the appellees and the ground upon which they based their rescission of the contract consisted in the failure of the appellant to pay " for the coal by them furnished " to the appellant for account of the School Board " during the month of July, 1901, at any time in the month of August, 1901, and up to and until September 3rd, 1901."

The contract provided that payments should be " made once a month by each department for all coal delivered to that department by the contractor during the previous month," and should " be made on the basis of what the coal " showed " on analysis." The provision for an analysis of the coal was an important one to the city—not so much in fixing the exact price of coal delivered, but in protecting the city against having supplied to it coal of inferior quality. The city of course could only act through its agents and no agent would have been justified in making payment for coal delivered until furnished with the analysis stipulated for in the contract. The appellees of course knew this or must be held to have known it. It was the duty of the city, however, to have the analysis in every case furnished within reasonable time and so that payments could be made for coal in accordance with the stipulation in the contract in that regard. Now, as to the analysis of the coal here in question the testimony shows that the City

Chemist in answer to a letter addressed to him by the appellees wrote them on the second of August, 1901, "it will be sometime before the coal delivered to the schools will be ready. There will only be one analysis for each district from each shipper, and the samples which I now have will be kept until all the coal to the schools is delivered, when I shall mix the samples and furnish the School Board with the analysis. I will consider it a favor if you will kindly let me know when all the coal which you are delivering to the several schools under your contract, has been delivered."

The chemist, as a witness, testified that he had had a misconception as to how the analysis for this coal was to be made but that during August he learned from the proper city officials how it was to be made ; that he had "a number" of visits from the appellees or one of them during August to inquire about the analysis and there was no complaint "about any delay" on his part "in furnishing the analysis ;" that he understood, and thought it was understood "by all hands concerned" that "only one analysis should be made for the summer of 1901," (referring of course to the analysis of the coal for the School Board); that he had an analysis ready by September 6th, 1901 ; and that it took three or four days to make it as he had a good many analyses from the other departments, and they had to take their turn. A brother of the appellees, an attorney, who represented them in their dealings with the city, as shown by his own and other evidence, testified as follows: "The July payment under the contract which he had with the Mayor and City Council under date June, 1901, we did not consider due until the first of September following." There is other testimony that might be adverted to in this connection ; but what has been noticed is sufficient, with the further fact that after the letter of the 2nd of August, 1901, the appellees went on delivering coal under the contract, to show that they waived such right as they may have had to rescind the contract because of the analysis not being furnished in August. They treated the contract as still in force, holding the appellant bound by all the terms thereof and ap-

parently intending on their part to continue its performance, without any notice of an intention to rescind or any act indicating such intention until September 3rd, 1901. The present suit was brought, and the recovery, here sought, was based, on the assumption of the contract being a subsisting one up to that date. The appellant was entitled to have these facts submitted to the trying tribunal and to the legal effect to flow from them if they should be found. *Bollman* v. *Burt*, 61 Md. 415; *McGrath* v. *Gegner*, 77 Md. 331; *Waggaman* v. *Nutt*, 88 Md. 265, 267–9, 276.

On the 3rd of September, 1901, upon the theory of a waiver by the appellees of an analysis of coal during August, there were two reasons why the appellees were not entitled to rescind the contract. To entitle them to call upon the appellant for performance on its part on the penalty of a rescission of the contract, in case of a neglect of strict performance, it was incumbent on them to show that they had fully complied with the agreement on their part, *Waggaman* v. *Nutt*, 88 Md. 265–7, 276, unless there be some reason appearing which, in law, is a legal excuse for not performing. The contract here in question contained a stipulation, by reference to an accompanying table that the appellees should deliver to the appellant for use of the School Board something over 6,600 tons of coal and that two-thirds of this amount should be delivered during the months of July and August. The appellant was not only entitled, by this stipulation, to have this quantity of coal delivered ; but also to have coal that would come up to the analysis prescribed and provided for in the contract. It did not gratify the contract to have a part of the coal delivered and coming within the analysis. The contract could only be gratified by having all the coal delivered and all coming up to the analysis.

When on the 3rd of September, 1901, the appellees attempted to rescind the contract instead of having delivered two-thirds of the coal as required they had by their own showing delivered less than one-third. How could they complain of the absence of an analysis upon which payment for the coal

was to be based when they had failed to deliver the coal of which the contract contemplated the analysis was to be made? There is no excuse attempted to be shown for non-performance of the contract on their part by the appellees other than that having reference to the absence of an analysis of the July delivery of coal which has already been considered. But even if there had been performance by the appellees of the stipulation of the contract as to the quantity of coal to be delivered there would still have been no sufficient legal justification for a rescinding of the contract on the third of September, 1901. No definite, fixed day was prescribed in the contract on or before which the analysis should be made ready. The obligation imposed in this regard therefore upon the appellant was to have it ready in a reasonble time subject of course to the provision in the contract as to making payments for coal. What is a reasonable time is a question of law for the Court. 2 *Parson's on Cont.*, 661; *Ragan* v. *Gaither*, 11 Gill & John, 472; *Burroughs* v. *Langley*, 10 Md. 248; *Mispelhorn* v. *Farm. Fire Ins. Co.*, 53 Md. 473.

The proof in the case shows that an analysis of the coal in question was ready within one week from the end of August and the appellees were so notified. From what appears in evidence, this was not an unreasonable delay of the analysis of the quantity of coal that was to be made the subject of analysis. The instructions granted by the trial Court at the instance of the appellees, in ignoring the facts and considerations pertaining to a waiver of analysis of coal delivered in July and to the right of the appellees to rescind the contract on the 3rd of September, 1901, shut out the defense of the appellant raised by its third plea and which there was evidence tending to support. In this, in my judgment, there was error. I agree with the majority opinion as to the rulings made upon the prayers proposed by the appellant.

(Filed February 11th, 1903.)