[No. 1823]

# R. M. HENNINGSEN, Respondent, *v.* TONOPAH AND GOLDFIELD RAILROAD COMPANY (a Corporation), Appellant.

1. CORPORATIONS—AGENTS—POWERS.

One employed to build in another state a standard-gage track in place of a narrow-gage one, and operate the road built, has authority to contract for the sale of narrow-gage ties removed from the track in the construction of the standard gage; he being the head officer in the state, charged with the management of the road.

2. CORPORATIONS—CONTRACTS BY AGENTS—RATIFICATION.

A person was employed to build in a distant state a standard-gage track in place of a narrow-gage one, and to operate the road. The president of the company assented to his statement that the narrow-gage ties removed from the road ought to be sold. A form of contract for sale was drawn up by the attorney of the company, and then turned over to the auditor. Deliveries of ties under the contract were made for about six or seven months under the direction of the person in charge. The president was informed of the execution of the contract soon after it was made. The company's auditor, chief clerk, and assistant treasurer had knowledge of the contract, and received payments for ties delivered under it. *Held,* that the company ratified the contract.

3. SALES—CONTRACTS—CONSTRUCTION.

A contract for the sale of narrow-gage ties used by a road prior to standard-gaging the same, which provides for the sale of all narrow-gage ties distributed at various places along the line, the agreement to remain in force until the company has delivered all of such ties, covers all the narrow-gage ties which the company removed in standard-gaging the track, or which it had on hand at the time the agreement was made, and the company could not exempt any ties it needed to build platforms, etc.

4. SALES—CONTRACTS—PAYMENT—WAIVER.

Where a seller of property for delivery in installments made deliveries without rendering statements or demanding payment at the time of delivery, and accepted payment later, he waived payment at the time of making deliveries, though entitled thereto under the contract.

5. SALES—CONTRACTS—PAYMENT—WAIVER.

Where a seller of property for delivery in installments failed to collect the price at the time of delivery, and accepted payments at varying times later, and continued to make deliveries, and did not present bills, other than those for which payments were made and accepted, and thereby allowed the delay in making payments to grow into a practice, until there was uncertainty as to the balance due, the seller could not cancel

the contract without presenting a statement of the amount claimed to be due, or making some demand and giving the buyer an opportunity to pay.

6. SALES—WAIVER—QUESTION FOR JURY.
    Where the facts on the issue of waiver of a provision in a contract of sale are admitted, or clearly established, the issue is one of law.

7. SALES—CONTRACTS—RIGHTS OF BUYER.
    Where a buyer of ties removed from a track in the construction of a standard gage contracted to accept a specified price for the ties which had been ordered by a third person, the buyer need not let the third person have ties at that price without limit as to time or number, when no definite number or period to cover further orders from the third person had been agreed on, but could charge a higher price, or refuse to make subsequent deliveries.

8. APPEAL AND ERROR—HARMLESS ERROR—ERRONEOUS INSTRUCTIONS.
    Where, under the admitted facts, the verdict rendered was justified, the error, if any, in a charge as to the duty of the jury to distrust the evidence of any witness who had wilfully sworn falsely to any material matter was not prejudicial to the defeated party.

APPEAL from the District Court of the Fifth Judicial District of the State of Nevada, Nye County; *J. P. O'Brien*, Judge.

Action by R. M. Henningsen against the Tonopah and Goldfield Railroad Company. From a judgment for plaintiff, defendant appeals. **Affirmed.** On petition for rehearing. **Denied.**

## STATEMENT OF FACTS

This action was brought to recover damages for failure to deliver all the ties designated in the following contract:

"This agreement, made and entered into at Tonopah, Nevada, this 28th day of November, 1905, by and between the Tonopah and Goldfield Railroad Company, a Nevada corporation, party of the first part, and R. M. Henningsen, of Goldfield, Nevada, party of the second part, witnesseth: The first party, as successor of the Tonopah Railroad Company, a corporation owning and operating a line of railroad from Mina, in Esmeralda County, to Tonopah, in Nye County, in the State of Nevada, is the owner of a quantity of narrow-gage ties heretofore used by said Tonopah Railroad Company in the construction, main-

tenance and operation of said line of railroad prior to standard-gaging the same; and whereas, negotiations have been pending between the first and second parties with a view to selling said ties by the first party to the second party, upon certain terms and conditions:

"Now, therefore, in consideration of the sum of one dollar, lawful money of the United States, paid to the first party by the second party, the receipt of which is hereby acknowledged, and other good and valuable considerations, the parties hereto have promised, covenanted, and agreed, and do hereby promise, covenant, and agree, as follows:

"(1) The first party will sell to the second party, and the second party will purchase from the first party, all and singular the stock of narrow-gage ties now owned by the first party, and distributed at various places along the line of the first party's railroad in Nye and Esmeralda Counties, State of Nevada, at the rate of eighteen (18) cents per tie.

"(2) The first party will deliver said ties to the second party at the first party's depot in Tonopah, Nye County, Nevada, or at its depot in Goldfield, Esmeralda County, Nevada, as may be designated by the second party, said ties to be delivered in 5,000 lots or less, at any and all times as may be demanded by the second party: Provided, however, that the second party will deliver to A. Tripp, as general superintendent of said Tonopah and Goldfield Railroad Company, ten days' written notice of demand for delivery of said lot of ties.

"(3) Said ties shall be loaded upon the cars of the first party, and transferred to Tonopah or Goldfield, at the expense of the first party. The second party shall unload said ties at the expense of the second party, and will pay for said ties at the rate of 18 cents per tie upon delivery thereof, the second party to unload said ties within twenty-four hours after their arrival at the destination designated: Provided, however, that the agent of the first party shall give to the second party the customary notice of arrival of freight.

"This agreement shall remain in force and effect until the first party has delivered to the second party all of the ties above mentioned.

"In witness whereof, the first party has hereunto set its corporate name, by its duly authorized agent, and the second party has affixed his signature, the day and year first above written.

"TONOPAH AND GOLDFIELD RAILROAD COMPANY,
"By Alonzo Tripp, Gen. Supt.
"R. M. HENNINGSEN."

Under the direction of Tripp, this contract was drawn up in the offices of the attorneys for the railroad company. He had previously received bids on the ties, and had been offered 12 and 15 cents each, and had later succeeded in persuading Henningsen to make a written offer of 18 cents apiece, after he had bid 15 cents for them. Tripp testified that he was present at the meeting in Philadelphia when the agreement was made under which he was employed and sent to Tonopah to build and operate the railroad; that his reports were made to Brock, the president of the railroad company, and all his correspondence with reference to the business was with the Philadelphia office; that he informed Brock that the ties were being stolen and burned, and that it was best to get rid of them some way; that he thought it was determined in his conversation with Brock that they ought to get 20 cents a tie; that in his talk with Henningsen, about the time the contract was made with him, it was said that it would take about two years to work off all the ties and complete the contract; that he wrote Brock he had made such a contract, soon after it was executed, and gave him the price of the ties; that the contract was shown to Brock when he came to Tonopah the winter after it had been signed; that Brock stated that no time limit was given within which the ties were to be delivered; that no objection to the sale of the ties was made to him by any director or officer of the company; that with instructions the contract was turned over to the auditor of the railroad company, and various sums of money paid on account of

the purchase price of ties were deposited through the clerks; and that when bills collectible were made he signed them, and they then passed under the control of the auditor.

On behalf of Henningsen, who was the plaintiff in the action, and who is the respondent in this court, testimony was introduced that directly subsequent to the execution of the agreement he sought to make sales of these ties, and with this purpose in view he applied to the superintendent of the Tonopah Mining Company, which owns the appellant railroad, or a controlling interest therein. The mining company had previously telephoned to the railroad company for ties, but had not sent any written requisition. Henningsen testified that thereafter he went to Tripp, the general superintendent of the railroad company, who told him there had been a little misunderstanding, that the Tonopah Mining Company had an order in previous to the signing of the contract, and that Henningsen and Tripp finally agreed that the ties that were taken to the mining company were to be delivered, and that Henningsen was to sell them to the mining company at 25 cents apiece, and that the railroad company, the appellant, settled at that price with him for these ties. At different times, for about six months more, the railroad company made various deliveries to Henningsen under the contract of ties in lots of one or more carloads at Tonopah and Goldfield, and he made various payments after deliveries.

Bills collectible for ties delivered under the contract were made up against him, signed by Tripp as general superintendent of the railroad, by the auditor, and by the chief clerk, and receipted by the assistant treasurer. These bills were on the company's printed forms, which contained the direction on the earlier ones that remittance be made to Alonzo Tripp, general superintendent, Tonopah, Nevada, and on the latter ones to W. L. Cardin, assistant treasurer, at that place. One of these bills, bearing the signatures of the chief clerk and the auditor, approved by Alonzo Tripp as general superintendent, and receipted by the assistant treasurer, bears the words:

"For ties delivered at Tonopah as per contract, 2,228 ties at 18 cents, $401.04." The charge on other bills for ties was at the contract price of 18 cents. The amounts on several of the bills are indorsed as having been credited to broad-gaging. Some of the payments made by Henningsen did not appear on these bills, nor on the company's books.

On June 1, 1906, J. F. Hedden succeeded Tripp as general superintendent of the railroad company and made further deliveries of ties under the contract as originally executed by Tripp. A voucher for four carloads of ties, dated as late as June 13, 1906, was approved by Hedden, and also signed by the auditor and receipted by the assistant treasurer of the company.

On June 28, 1906, the following notice was served: "To Tonopah and Goldfield R. R. Co.: You are hereby notified that there are now, at the date hereof, by actual verified count, one hundred one thousand four hundred (101,400) narrow-gage railroad ties distributed along the railroad right of way between Tonopah and Mina, all of which are covered by and included in that certain contract of sale and purchase made between you and the undersigned, of date the 28th day of November, 1905. Under and by virtue of the terms of said contract all of these ties are the property of the undersigned, and you are hereby expressly notified that you are required to deliver the same to the undersigned on demand in compliance with the terms of said contract. You are hereby further notified that since the execution of said contract you have, without notifying the undersigned, and without his consent, appropriated to your own use for construction purposes along the railroad right of way, five thousand eight hundred eighty-two (5,882); and for the Midway Mill, Tonopah, one thousand and twenty-five (1,025) narrow-gage ties, a total of six thousand nine hundred seven ties, all the property, on demand, of the undersigned, and for which bill is hereby rendered hereto attached. You are also further notified that, under the calculation made between you and the undersigned at the time of the exe-

cution of said contract, viz., November 28, 1905, as to the number of ties passed thereby, there are missing and unaccounted for twenty thousand ties, which the undersigned will demand in due course of the fulfillment of such contract. This will also serve as further notice, in addition to that heretofore served upon you, that for all narrow-gage ties obtained or received by or through you from and after June 21, 1906, you will be charged the net rate and price of 50 cents per tie. Dated Tonopah, Nevada, June 28, 1906. R. M. Henningsen."

Attached to this notice was a bill charging for ties and giving credit for ties, with a balance of $46.27, which Henningsen claimed was due him from the railroad company.

On July 10, 1906, Henningsen made written demand on the railroad company for the delivery of two cars of ties at Goldfield as soon as possible. On July 16, 1906, Hedden sent the following letter to Henningsen: "Mr. R. M. Henningsen, Tonopah, Nevada—Dear Sir: Referring to your request to have two cars of narrow-gage ties shipped to Goldfield: Inasmuch as you have not yet paid for the last lot of narrow-gage ties shipped to you at Goldfield, as well as for a previous lot, amounting to in the neighborhood of $900, we consider that you have violated the agreement by reason of this nonpayment, as it specifically states that these ties are to be paid for upon their arrival at destination. This violation we consider abrogates the agreement, and we do not feel that you have any claims upon us by reason of the agreement. Yours truly, J. F. Hedden, General Superintendent."

At this time there had been no refusal or failure by Henningsen to pay for any ties for which bills or statements had been rendered, and all bills collectible which had been made out by the railroad company had been paid, as shown by the books of the company, and he asserts that he was not given credit for checks paid by him from March 1 to June 1, 1906, aggregating about $1,400. He testifies that at the time this letter was written he was not indebted to the railroad company for any

ties delivered. He claims credit for payments which had been made to station or ticket agents for the railroad company and not credited to him, and for 7 cents each, the difference between 18 cents which he was paying and 25 cents which he states the railroad company was to pay for ties delivered to the mining company. He claims the excess above 18 cents up to 50 cents on the ties sold or delivered to other parties by the railroad company. Part of the ties—it is claimed about one-half or one-third—were suitable for mining timbers, and were sold as high as 50 cents apiece, and others were sawed up and sold for wood at Tonopah and Goldfield, in which places respondent placed woodyards and machinery for sawing. On his part it is calculated that thirty ties made a cord of 12-inch wood, and thirty-six ties a cord of 14-inch wood; that the average cost per cord for sawing was $62\frac{1}{2}$ cents and for hauling $1.$62\frac{1}{2}$; that the profit on ties sold for mining timbers was 32 cents, and on ties for wood when thirty were used to the cord 21.2 cents, and when thirty-six were used to the cord 14.6 cents. Further damage is claimed on woodyard plants, which were established for sawing and selling the ties.

Of the 36,337 ties delivered, it is claimed by Henningsen that 9,245 were delivered to the Tonopah Mining Company and 1,025 to the Midway Mill, owned by the mining company, or a total of 10,270 to the Tonopah Mining Company. After the termination of the transactions with Henningsen there still remained undelivered to him by the railroad company 108,305 ties; but of these 16,343 had been put into platforms, buildings, and bunkers, or left in sidings, still leaving 92,000. Among the estimates of damage made by respondent's counsel is one in which is allowed appellant's claim that one-quarter of the narrow-gage ties still remain in the main track, and one-quarter of 92,000, or 23,000 are deducted. In another estimate, made with reference to the testimony of the witness White, 10 per cent of 92,000, or 9,200, ties are deducted as remaining in the main track, leaving 82,000, to which was added 8,500 for ties used by the railroad

company in platforms, buildings, and bunkers after the contract was executed. The witness stated: "I think about 10 per cent of the ties were used in the railroad roadbed beneath the rails. * * * Some of these ties which were in the roadbed were used on the switches and sidetracks. There were very few of them in the main roadbed."

From these and other answers of the witness it appears that he meant to testify that about 10 per cent of the narrow-gage ties remained in the roadbed, but that the most of these were in the sidetracks.

There was a verdict in favor of the plaintiff for $20,588, and the appeal is taken from the judgment and from an order overruling the motion for a new trial.

*Campbell, Metson & Brown,* for Appellant:

Henningsen breached his contract by failing to make payments due; he was in debt to the railroad company on the day the company sent him the notice of July 16th.

Mindful of the rule of appellate courts regarding the conflict of evidence, we will confine our argument to the undisputed evidence in the record.

The record shows the number of ties delivered direct to Henningsen at Tonopah, and also the number delivered to him at Goldfield. It also shows the number of ties sold direct by the railroad company to the Tonopah Mining Company and other parties; and likewise the number which the railroad company used for its own purposes, that is, those appropriated to its permanent use and those appropriated to its temporary use.

The record shows the total number of payments claimed to have been made by Henningsen to the railroad company, and—most conclusive of all—it shows a written statement prepared by Henningsen himself on June 28, 1906—at a date almost contemporary with the date of the last transaction between the two parties—showing the debit and credit relations between the parties at that time, according to Henningsen's own figures and records.

Therefore, by way of recapitulation, the record furnishes complete and unconflicting evidence on these points:

1. The total debt due from Henningsen to the railroad company for ties delivered direct to him under the agreement.

2. The total number of payments claimed to have been made by Henningsen to the railroad company, all of said payments having been made by check.

3. The total amount of credits or offsets claimed by Henningsen to have accrued in his favor and against the railroad company, and arising from sales made by the railroad company to third parties, or arising from the appropriation of ties to the railroad company's own use.

Manifestly, these three groups of figures embrace all the elements of our controversy under this particular head. They present a simple problem in arithmetic. If we know the aggregate debt, and also the aggregate offsets, then we know that the difference between the two items will represent the sum necessary to be paid by check. (All payments made by Henningsen to the company were by check.)

Before proceeding with the analysis of the evidence, it may be pertinent to observe that at the trial, and at the argument of the motion for a new trial, plaintiff's counsel relied solely upon the figures in the record (as they were bound to do, we think) and contended that the figures were sufficient to prove that Henningsen was not in debt to the railroad company.

It is an elementary principle of law that if anything remains to be done at the time a contract for sale is made, either to determine the identity of the thing sold, the quantity, the price, or delivery, until such thing is done the contract is executory, and the title does not pass to the purchasers. (*Messer* v. *Woodman,* 22 N. H. 172, 53 Am. Dec. 241; *Herman* v. *Whitescarvers,* 89 Ky. 633, 13 S. W. 103; *Darden* v. *Loveless,* 52 Ala. 289; *Moffat* v. *Green,* 9 Ind. 198; *Gibbs* v. *Benjamin,* 45 Vt. 124; *Hudson* v. *Weit,* 29 Ala. 294; *Screws* v. *Roach,* 22 Ala. 675;

*Cost* v. *Riley,* 62 Conn. 57, 24 Atl. 519; *Keeney* v. *Dow-
den,* 46 Ga. 401; *Stanley* v. *Robinson,* 14 Ill. App. 480;
*Dixon* v. *Duke,* 85 Ind. 434; *McClung* v. *Kelly,* 21 Iowa,
508.)

In *Comaita* v. *Kyle,* 19 Nev. 38, where there was a
delivery of a bill of sale to a quantity of coal accompa-
nied by no other acts or delivery or possession, it was
held that the sale was void as to attaching creditors.

In this case what would have been the situation if the
property had been destroyed by fire? Would Henning-
sen have paid for the ties, or can it be said that he would
have assumed any responsibility for them? Did Hen-
ningsen own the stock of ties? Could he have sold them
to a third party? Would such third party acquire title
under such sale? If not, then Henningsen was not
entitled to claim credit for any ties which were sold or
used by the railroad company; and he has in no way
attempted to prove payment for the amount of ties
delivered to him except by offsets of this kind.

Obviously, this was not, either in the letter of the
contract or the contemplation of the parties, a sale by
which the title to the ties passed. "The first party will
sell to the second party, and the second party will pur-
chase" is the language of the contract. Our contract
was simply an agreement to deliver—to perform on
demand.

If our contention on this latter proposition be well
founded, then Henningsen was not entitled to credit
for—nor was he in any manner concerned with—either
the ties used by the railroad company for its own use or
the ties sold by the railroad company to the mining com-
panies; and no claim against the railroad, or right of
action, could arise in favor of Henningsen so long as the
railroad continued to deliver ties on demand to Henning-
sen, and provided (in the event of the complete perform-
ance of the entire contract) that the railroad would
procure and deliver to Henningsen a quantity of narrow-
gage ties in lieu of the ties theretofore used by the rail-

road company for its own purposes or sold by the railroad company to the mining companies.

Before leaving this particular item, let us consider the point from another angle of view—the language of the agreement of November 28, 1905: "Will sell  *  *  * will purchase  *  *  * the stock of narrow-gage ties  *  *  * distributed  *  *  * along the line."

What is the "stock"? Courts frequently have been called upon to interpret its meaning in contracts for the sale of merchandise, and other agreements of a miscellaneous character. Does it include goods or chattels which have been segregated from a general stock and appropriated to a specific use? If a hardware merchant segregates a quantity of wagon tongues, wheel rims and brake fixtures from his stock, and uses them for the necessary equipment of his delivery wagons or freighting outfits, would it be held that said items were embraced in any written transaction which was couched in the same language as the Tripp-Henningsen agreement?

Stock, in mercantile law, is defined to be "goods or chattels which a tradesman holds for sale or traffic." (*Commonwealth* v. *Danville H. & W. R. Co.*, 2 Pears. 400.)

"Stock" does not include a wagon, with patent couplings attached, used by the owner in carrying on his business of selling patent couplings." (*Gibson* v. *Gibbs*, 75 Mass. 62.)

"Stock: Generally comprehends articles accumulated in a business or calling for use and disposal in its regular prosecution." (*Jewell* v. *Trustees*, 84 N. W. 973.)

"Stock: Goods and merchandise in trade." (*Whiting* v. *Root*, 3 N. W. 134.)

"Stock: Goods kept by the merchant for sale in the course of business." (*Harness* v. *Williams*, 1 South. 756.)

Reverting to the language of the agreement—"ties distributed along the line"—can it be said that ties in the bunkers, platforms or buildings are distributed?

Again, the ties affected by the agreement are described

as "ties heretofore used." Would the wagon tongues, wheel rims or brake apparatus, mentioned in the above illustration, or the ties now used in the bunkers, platforms or buildings, come under the description of articles "heretofore" used?

Take the four corners of the agreement and read it according to the language it contains, and according to the rules of interpretation, and we think it sustains our position. One of the first canons of construction is that it shall be reasonable. Would it not be manifestly unreasonable to hold that the terms of this agreement included the ties which the company was using and which it needed in its own business and which already had been appropriated to such use?

We think our views on this proposition as hereinabove set forth, are well founded; but if this court entertains a contrary view, then we still contend that Henningsen is precluded from claiming a credit for these particular bunker ties, because his man Alling, who made the count of ties, testified that all of these ties, used in the bunkers, could have been brought into Tonopah and Goldfield by the railroad company and delivered to Henningsen any time on his demand; and consequently he was no more entitled to claim a credit of 7 cents per tie for the ties standing in the bunkers than he would be to claim a credit for any of the balance of the stock of narrow-gage ties stacked along the right of way.

Eliminating this one item alone—5882 ties at 7c equal $411.74—Henningsen stands self-confessed upon the record as having defaulted his payments for the June deliveries at Goldfield.

Henningsen claims to have made an agreement with Alonzo Tripp to sell ties to the railroad company at 25 cents per tie; that it was verbal; that it relieved him, Henningsen, according to his interpretation, from the strict requirements of the stipulation "to pay on delivery," contained in the original agreement of November 28, 1905, and that under its operation—yielding him a credit of 7 cents for each tie sold by the railroad com-

pany to the mining companies or appropriated by the railroad company to its own use—he canceled many hundreds of dollars due from himself to the railroad company under the written agreement above mentioned.

The statute required the alleged 25-cent agreement to be in writing.

The Nevada act, under which defendant is incorporated (Comp. Laws, 971, *et seq.*), probably is a transcript of the California act of May 20, 1861 (Laws of 1861 (Cal.), p. 609).

The predicament in which the plaintiff and defendant found themselves in the trial of this case, one side affirming the existence of an agreement to sell ties to the railroad company at 25 cents, and the other side flatly disaffirming the existence of any such agreement, with all the consequent embarrassment which that dispute precipitated upon the trial court, fully vindicates the wisdom of our legislature when, in said act entitled "An act to provide for the incorporation of railroad companies and the management of the affairs thereof," they provided that "no contract shall be binding upon the company unless made in writing." (Comp. Laws, 981.)

Under this statutory rule, it was error to admit oral proof of the alleged 25-cent agreement. This testimony was admitted without objection on the part of defendant. Where no objection is made, it is ordinarily too late to raise the point on motion for new trial or appeal.

"But a new trial may be granted where the incompetent evidence was prejudicial." (14 Ency. Pl. & Pr. 772.)

"A new trial may be granted where the incompetent evidence admitted without objection might have turned the scale." (*Pulver* v. *Rochester German Ins. Co.*, 35 Ill. App. 24, cited in 14 Ency. Pl. & Pr. 772.)

"A reviewing court will reverse a case when the verdict rests upon the testimony of the plaintiff which is positively contradicted by the defendant, who is corroborated by disinterested witnesses." (14 Ency. Pl. & Pr. 775.)

"A new trial may be granted where a verdict rests in the uncorroborated testimony of the plaintiff, which is squarely contradicted by one witness, and there is corroborative testimony of another witness to a state of facts which if true would operate as an absolute bar to the action." (*Illinois Cen. R. R.* v. *Alexander,* 46 Ill. App. 505; 14 Ency. Pl. & Pr. 775.)

"It is immaterial by what process the erroneous result was reached, thus a new trial will be granted where a jury relied upon a claim which had been completely disproved (the 25-cent agreement) or gave credence to testimony which was false or improper." (Henningsen: "I paid all I owed. I paid the railroad eight to ten thousand dollars.") He never owed more than $6,540.66.

The California act, *supra,* was interpreted by the California Supreme Court, in *Pixley* v. *W. P. R. R. Co.,* 33 Cal. 183, and *Foulke* v. *San Diego R. R. Co.,* 51 Cal. 369.

Both cases hold that if the railroad received any benefit under the agreement we may be bound by it, even though it be verbal.

But the railroad company received no benefit under the alleged agreement. It received no money from Henningsen for these ties.

The alleged 25-cent agreement was *ultra vires.*

The defendant had no corporate power, either through its board of directors or any other instrumentality, to make and enter into the alleged agreement. Where, in the constituent act, is to be found the authority which permits the railroad company to go into the market or any place else and purchase ties for the sole purpose of vending them to third parties?

In *Alexander* v. *Caldwell,* 83 N. Y. 480, the plaintiffs claimed to be creditors of the New York Mutual Coal Co. Defendants denied the claim. The question on appeal was the sufficiency of proof of the plaintiff's claim. The coal company was formed for the purpose of "working coal mines and the mining for coal in the mines situated on the DeLong tract, so called, in the township of Blythe, Schuylkill County, State of Pennsylvania, which shall

be held by said company under leases, and the transporting to market and the vending of said coal." On June 30, 1866, Ball, the treasurer of the coal company, addressed a letter under the heading "New York Mutual Coal Co.," to the plaintiffs, who were retail coal dealers in the city of New York, in which he said: "We wish to make an arrangement with you to furnish us coal at as low price as possible, delivered to any part of the city we may direct, you collecting the bills in the name of our company, and we paying you the difference due each month; also to deliver all coal from our mine as it arrives, and any balance left over to store in your yard, or in other words, your firm to act as delivery agent for our company." This letter the plaintiffs answered on the 2d day of July, assenting, substantially, to the proposed arrangements. Under this arrangement, upon orders issued by Neal and by Ball from the office of the company, the plaintiffs, between July 4 and August 10, 1866, delivered coal to divers persons to the value of nearly $1,000, and this action was brought to recover the balance due them for this coal.

It did not appear that these transactions were known to any of the directors, or that they appeared on the company's books. The court, by Justice Earl, said: "It was no part of the company's business to purchase coal in the market and sell it to its stockholders or others.

"We have not here the question which would have to be considered if these transactions, outside of the legitimate business of the corporation, had been actually authorized by the board of directors. But we have the question whether the company was bound for this debt thus created by its secretary and treasurer assuming to act for it. We are of the opinion that it was not.

"Every one knows that corporations are artificial creations existing by virtue of law, and organized for purposes defined in their charters; and he who deals with one of them is chargeable with notice of the purpose for which it was formed; and when he deals with agents or officers of one of them, he is bound to

know their powers and the extent of their authority. Corporations, like natural persons, are bound only by the acts and contracts of their agents done and made within the scope of their authority. Here the plaintiffs were chargeable with knowledge that this corporation was organized for the purpose of mining coal and bringing it to New York for its stockholders or for sale. They were chargeable with notice that it was no part of the legitimate business of the corporation to go into market and buy coal for sale again to others. And it was not, upon any facts here appearing, within the scope of any apparent authority conferred upon the secretary and treasurer to purchase this coal of the plaintiffs. It can never be presumed that an agent of a corporation had authority to transact business which the corporation itself was not, by its charter, authorized to engage in.''

We think the two cases sufficiently analogous to warrant the contention that the New York case is a fair precedent for the case at bar.

In any event, the 25-cent agreement could not bind defendant unless ratified.

In support of this proposition, we rely upon the authorities cited under the discussion of the ratification of the written agreement of November 28, 1905, in a later part of this brief.

Where is there any proof in this record to show that the defendant company's board of directors had knowledge of Tripp's alleged agreement to purchase ties at 25 cents? The railroad company had absolutely no written record of any such agreement; Tripp did not report any such agreement to the board of directors nor to any officer or director of the company; Tripp swears that no such agreement existed. There is nothing in the vouchers to show the existence of such an agreement, except as they are interpreted through Henningsen's *ipse dixit*. In short, there is no evidence of such an agreement, nor any scintilla of such evidence from one end of the record to the other, except Henningsen's word of mouth, and it is not reported that Henningsen called it to the knowl-

edge of the board of directors. (*Alexander* v. *Caldwell,*
83 N. Y. 485; *Lonkey* v. *Succor M. Co.,* 10 Nev. 17.)

The responsibility of the principal does not extend to
collateral contracts made by the agent in excess of his
actual or ostensible authority and not known to the prin-
cipal. (*Baldwin* v. *Burrows,* 47 N. Y. 179, 215; *Wheeler*
v. *N. W. Sleigh Co.,* 39 Fed. 347; *Smith* v. *Tracy,* 36 N. Y.
78.)

Under the decisions of the courts, and more particu-
larly under the rulings of this court—from *Yellow Jacket*
v. *Stevenson* down to *Edwards* v. *Carson Water Co.,*
*post*—Tripp's 25-cent agreement, which was unauthor-
ized in the first instance and never ratified by the board
of directors, cannot operate as a binding agreement
against the company.

The stipulation requiring payment on delivery was not
relaxed.

In the case of *Lonkey* v. *Succor M. Co.,* 10 Nev. 17, a
contracting party agreed to sink a shaft for said com-
pany, and to pay for all the timbering. The company's
superintendent, by verbal agreement, attempted to relax
the payment clause. It was held the oral agreement was
not binding on the company.

In the case at bar, who relieved Henningsen from the
written stipulation to pay on demand? Not Alonzo Tripp.
It would not be binding if he did. If it was attempted
to be done by any person in the Tonopah office of the
railroad company it was by Herbert Tripp (who was
not even shown to be an employee of the railroad, but
whom the record shows to have been secretary to Alonzo
Tripp), who accepted some payments from Henningsen
subsequent to the time when the same were due.

The trial court's instruction to the jury was correct
under this head. Few principles are better settled by
an unconflicting current of authority than that a fail-
ure on the part of one contracting party to pay at
the time stipulated, in a contract requiring the pay-
ment of moneys at a stipulated time or in a stipulated
manner, gives the other party the right to terminate

the contract, and the trial court instructed the jury in substance that if any sum remained due from the plaintiff to the defendant for ties delivered, the plaintiff was not entitled to recover. (*Bennett* v. *Taylor*, 84 Pac. 533; *National Machine & T. Co.* v. *Standard Shoe Co.*, 63 N. E. 900; *Rugg* v. *Gigner*, 26 Atl. 502; *Mayor of Baltimore* v. *Schaub Bros.*, 54 Atl. 109; *Cresswell Ranch and Cattle Co.* v. *Martindale*, 63 Fed. 89; *Hull Coal Co.* v. *Empire C. & C. Co.*, 113 Fed. 261; *Minaker* v. *Cal. Canneries Co.*, 138 Cal. 239; *Soltan* v. *Goodyear Vulcantile Co.*, 33 N. Y. Supp. 81; *Wood, Curtis & Co.* v. *Scurich*, 90 Pac. 51; *Savannah Ice Del. Co.* v. *Am. Refrigerating Co.*, 35 S. E. 280; *Barnes* v. *Denslow*, 9 N. Y. Supp. 53; *Winchel* v. *Stott*, 21 N. E. 1065; *Kokomo Strawboard Co.* v. *Inman*, 31 N. E. 249; *Johnson Forge Co.* v. *Leonard*, 51 Atl. 305; *Withers* v. *Reynolds*, 2 B. & Ad. 882; *Beauchamp* v. *Archep*, 58 Cal. 431; *Meeker* v. *Johnson*, 28 Pac. 542, 32 Pac. 772.)

This court cannot hold that there were any settlements of cross-demands made by Henningsen, as his evidence when boiled down to the last analysis shows that on one occasion, and on one occasion only, he presented a statement to the railroad company, and the uncontradicted evidence shows that no settlement was had thereon, and that the same was disputed by Tripp, who refused to settle or pay the alleged account.

The jury was also instructed in substance that the claims of plaintiff for ties appropriated by the defendant would not constitute an offset or cross-demand in favor of the plaintiff, unless it was expressly agreed between the parties that such cross-demand was to be credited to the plaintiff and treated as payment on the contract.

A cross-demand, no matter how clearly proved, does not constitute a payment. It can only amount to a payment by an agreement of the parties. (*McCurdy* v. *Middleton*, 82 Ala. 131, 2 South. 721; *Hill* v. *Austin*, 19 Ark. 230; *City Savings Bank* v. *Stevens*, 15 N. Y. Supp. 139; *Kennedy* v. *Davidson*, 23 S. E. 291; *Ulsch* v. *Muller*, 9 N. E. 736.)

A payment is the extinguishment of a debt, and is not in the nature of a set-off which may be used or admitted as a defense at the pleasure of the defendant.  (*Broughton* v. *McIntosh*, 1 Ala. 103.)

In the case of *Strong* v. *McConnell*, 10 Vt. 231, the defendant held a note against plaintiff, and contracted with plaintiff for the delivery of 10,000 feet of good hemlock boards.  Plaintiff delivered to him certain boards, planks and sled runners from time to time, and defendant directed plaintiff to keep an account of the quantity with a view of future adjustment.  Defendant also kept an account of the boards by crediting them on his books. *Held*, that the lumber delivered did not constitute a payment of the note.  The parties contemplated a future action before it could be applied as payment.  Mutual debts do not *per se* extinguish each other.  To effect such extinguishment, there must be some act of the parties, while debtor and creditor, by which they determine that one shall go in satisfaction of the other, which act must be of binding efficiency so as to accompany the claims into whosesoever hands they may pass.  (*Past* v. *Carmalt*, 37 Am. Dec. 484.)

Mutual indebtedness does not work an extinguishment of the respective debts without the application of them to each other by the concurrent acts of the parties. (*Seitzinger* v. *Alspack*, 4 Atl. 203.)

The agreement of November 28, 1905, is not binding on defendant for the reasons that (I) Alonzo Tripp had no authority to execute said agreement and (II) it was never ratified by defendant.

I.  All of the authorities lay down the elementary principle that persons dealing with officers and agents of corporations are bound to take notice of the fact that they act under charters and general statutes, which more or less define the extent of their power, and that such persons must acquaint themselves with the extent of that power.

The constituent act of the Tonopah and Goldfield Railroad Company, viz., the act of March 22, 1865 (Comp.

Laws, 971, *et seq.*), lodges in the board of directors the power to execute agreements like the one under consideration.

Section 9 of the act provides: "The directors shall, for and on behalf of such company, manage the affairs thereof, make and execute contracts of whatsoever nature and kind, and exercise generally the corporate powers of the company."

The corporate powers are specified in section 17.

"Sec. 17. Every railroad corporation shall have power:

"Eighth—To receive by purchase, donation, or otherwise, any lands, or other property, of any description, and to hold and convey the same in any manner the directors may think proper, the same as natural persons might or could do, that may be necessary for the construction and maintenance of its road, or for the erection of depots, turnouts, workshops, warehouses, or for any other purpose necessary for the convenience of such companies, in order to transact business for such railroad companies."

In the first instance, then, the power to execute an agreement for the sale of many thousand dollars' worth of the defendant's property was vested in the directors, as a board. In order to make the Tripp contract of November 28th binding on the corporation, the plaintiff was required to show that the board, by suitable action, had delegated the power to Tripp, or else that the board had ratified the contract.

The first of these alternatives is negatived by the record. Tripp stated positively that he had no authority from the board. This was not contradicted, nor did the plaintiff offer any evidence of a direct delegation of authority.

II. In order to maintain his case against the defendant, plaintiff was required to show a corporate ratification of the agreement.

Ratification must, of course, be had by the body having power to contract in the premises. This was the board.

President Brock could not ratify the contract, because the president, as such, had no power in the first instance tc make the contract.

At the trial, we objected to the admission of the contract, and upon the conclusion of the plaintiff's case we moved to strike it from the record, for the reasons above stated.

We now proceed to marshal the authorities in support of our position:

"No doctrine is better settled, both on principle and authority, than this—that the ratification of an act of an agent, previously unauthorized, must, in order to bind the principal, be with a full knowledge of all the material facts." (Story, J., in *Owings* v. *Hull,* 9 Pet. 608, 629.)

"The party relying upon an implied ratification of an unauthorized act has the burden of showing affirmatively that the principal had full knowledge of all facts relating to the transaction in question. It is not for the other party to show ignorance of such facts." (*Nixon* v. *Palmer,* 8 N. Y. 398; *Smith* v. *Tracy,* 36 N. Y. 79; *French* v. *O'Brien,* 52 How. Pr. 394; *Mapp* v. *Phillips,* 32 Ga. 72; *Clark* v. *Lyon Co.,* 7 Nev. 75; *Hillyer* v. *Overman,* 6 Nev. 51; *Rankin* v. *N. E. M. Co.,* 4 Nev. 78.)

The rule was enunciated by the California Supreme Court in the early case of *Billings* v. *Morrow,* 7 Cal. 171: "It is a well-settled rule that a principal who ratifies the acts of his agent must be made acquainted with the character of those acts, and unless all the circumstances are made known to him, the ratification is void."

In *Davidson* v. *Dallas,* 8 Cal. 244–5, the court adopts the language above, and adds: "The acts of an agent beyond his authority, are as the acts of a stranger; and before the principal can be bound, he must know what has been done, so that he may advisedly exercise his own judgment upon the circumstances in the same way as if he had originally made the contract himself. There is no proof of any ratification by any act of Dallas done after a full knowledge of the circumstances."

*Murray* v. *C. N. Nelson Lumber Co.,* 9 N. E. (Mass.)

634: Plaintiff brought two actions on a contract to pay a salary of $10,000 per annum. The contract was executed on behalf of defendant, by the "C. N. Nelson Lumber Co., by Chas. N. Nelson, Pres." Plaintiff recovered. Exceptions sustained in supreme court. Morton, C. J., said: "In each of these cases, the first count of the plaintiff's declaration is upon a written contract executed on behalf of the defendant by Charles N. Nelson, its president. It is conceded, and the superior court so ruled, that Nelson, who was president and general agent of the defendant corporation, had no authority, as such, to execute the contract. There was evidence that one director besides the president knew of this contract, but there was no direct evidence that the other three directors had any knowledge of it.

"It is the well-settled rule that a ratification, by a principal, of the unauthorized acts of an agent, in order to be effectual, must be made with a knowledge, on the part of the principal, of all the material facts, and the burden is upon the party who relies upon a ratification to prove that the principal, having such knowledge, acquiesced in and adopted the acts of the agent. It is not enough for him to show that the principal might have known the facts by the use of diligence.

"In the case at bar, therefore, it was incumbent upon the plaintiff to show that the directors, or at least a majority of them, knew of the contract and its terms, and that, with such knowledge, they acquiesced in and adopted it."

In our own state this court has had frequent occasion to enunciate and apply the law under this head. (*Clark* v. *Lyon County,* 7 Nev. 75; *Yellow Jacket M. Co.* v. *Stevenson,* 5 Nev. 228; *Hillyer* v. *Overman M. Co.,* 6 Nev. 55; *Lonkey* v. *Succor M. Co.,* 10 Nev. 17; *Rankin* v. *N. E. M. Co.,* 4 Nev. 78; *Edwards* v. *Carson Water Co.,* 21 Nev. 469.)

In *Clark* v. *Lyon County, supra,* the court elucidated the theory which underlies the doctrine of ratification, and stated it with a degree of cogency and simplicity

· which we have found nowhere surpassed in any judicial utterance on the subject: "As it is essential to the validity of a contract that the minds of the contracting parties meet in harmonious understanding as to its tenor and provisions, so it is no less essential, where it is sought to charge a party with ratifying it, that he give his assent understandingly; for a ratification is after all but the execution of a contract on the part of the person ratifying it—it is the giving of his assent, without which no obligation would be imposed upon him. Hence the rule respecting ratification."

The court held that it was not enough that the commissioners of Lyon County knew of the existence of the contract unless they also knew its particulars; not enough that one of the commissioners knew about it; and not enough that they actually paid four hundred dollars, on account, for services rendered under it. "No act will amount to a ratification of an unauthorized contract, unless the person charged with the ratification is cognizant of all the material features of the contract which he is claimed to have ratified," said Lewis, C. J.; and he added: "It was incumbent on the plaintiffs, who relied on ratification, to prove that the commissioners knew of the contract, and not upon defendant to establish the negative."

In *Yellow Jacket M. Co.* v. *Stevenson, supra,* the president of the mining corporation executed, without authority, a lease of a portion of the company's premises to Stevenson. The court said: "Here there is no evidence that the board of trustees, as such, knew of Stevenson's occupation; and the acceptance of the money, paid by him, could not raise a presumption of such knowledge. If, then, it be the law that there must be a full knowledge of all the material facts, before the acceptance of profit or advantage by the principal will be held to constitute a ratification, surely the respondent here cannot be held upon the lease in question, for it knew nothing of the material facts respecting it."

The court added: "It cannot, we think, be maintained

that the knowledge obtained unofficially by three of the trustees, that Stevenson was engaged in extracting ore from the mine, is sufficient to charge the company with such knowledge. As any number of trustees, acting individually and not as a board, cannot act for the corporation, so any information obtained by individual trustees, and not communicated to the board, should not, it would seem, become the foundation of a contract binding upon the company. The trustees represent the corporation only when assembled together and acting as a board. Such being the law, how can it be claimed that information communicated to them individually, but not to the board, can be made the foundation of an implied contract on the part of the corporation? But, however this may be, it cannot possibly be maintained that a corporation can be charged with acting upon, or recognizing a fact which is known only to a minority of its trustees. As it required a concurrent action of a majority to execute an express contract on its behalf, the action of, or information communicated to any number less than a majority, cannot become the basis of a contract binding upon the company. In this case, the three trustees who knew that Stevenson was extracting ore from the mine, might be deemed to assent to it; still, unless they constitute a majority of the members of the board, their action or implied assent could no more bind the corporation than an express contract entered into by any one of them alone could. The record here does not show that there were a majority of the board of trustees of the plaintiff, a fact necessary to be shown by the defendant before he could claim the corporation to be bound by their act, or be chargeable with information obtained by them. So, even if it were admitted that the act of a majority of the trustees, not acting as a board, could not bind the corporation, still as it is not shown in this case, that a majority did so act, or have knowledge of Stevenson's possession, the result here would be unchanged."

*Hillyer* v. *Overman M. Co., supra*: An arrangement

was made between the plaintiffs and the superintendent of the defendant, whereby plaintiffs rendered legal services to defendant. The superintendent paid the retainer for several months. Defendant successfully resisted suit for the balance. The court said: "The trustees can only bind the corporation under our law when they are together as a board, acting as such (citing *Yellow Jacket M. Co.* v. *Stevenson, supra*). The plaintiff's proposition not having been brought to the knowledge of the board, it cannot be presumed it knew anything of it, and consequently cannot be held to have accepted it. The burden of establishing the contract was upon the plaintiffs; having failed to do this, the judgment must be reversed."

*Rankin* v. *N. E. M. Co., supra*: An action to recover on contract for mine timbers. *Held*, that the acceptance and use of the timbers by the defendant company would not operate as a ratification unless the plaintiff proved that it was with full knowledge on the part of the board.

*Lonkey* v. *Succor M. Co., supra*: Here was a written agreement on the part of one Grant to sink a shaft and pay for all timbering. The superintendent of the mining company subsequently made a verbal agreement, purporting to relax the timbering clause. The court found that the undertaking on the part of the superintendent was unauthorized and that no knowledge of the matter had been brought home to the corporation and therefore held it was not bound.

*Edwards* v. *Carson Water Co., supra*: The court said: "As we understand the law, it is this: That before an individual or corporation can be held to have ratified the unauthorized acts of his or its agents, every detail of the transaction must be made known to the principal." (Reviewing *Yellow Jacket M. Co.* v. *Stevenson*, and *Hillyer* v. *Overman M. Co., supra.*)

We respectfully submit to the court that the record in the case at bar falls clearly within the rules and precedents established by the court in the foregoing cases. Plaintiff failed to show a ratification of the unauthorized agreement.

It may be that plaintiff relied upon the payment of moneys to the defendant to establish a ratification. If so, his record still falls short of the mark; for no ratification can be established from the fact of the retention of moneys unless it be affirmatively proven that the directors retained them with a knowledge of the attendant circumstances. It is knowledge—not notice—which the rule of ratification requires; and money paid to and retained by the corporation does not constitute ratification unless the board of directors are proven to have knowledge of the account on which the moneys are paid and the terms of the contract. (*Yellow Jacket M. Co.* v. *Stevenson,* 5 Nev. 224; *Wheeler* v. *Northwestern Sleigh Co.,* 39 Fed. 347; *Baldwin* v. *Burrows,* 47 N. Y. 199; *Penn Co.* v. *Dandridge,* 36 N. Y. 78; *Jackson* v. *Badger,* 26 N. W. 909; *P. R. M. Co.* v. *D. S. & G. R. Ry. Co.,* 5 Fed. 858.)

The foregoing argument, touching the status of the written agreement of November 28, 1905, is equally applicable to the alleged oral agreement between Henningsen and Tripp whereby Henningsen agreed to sell ties to the railroad at 25 cents per tie. Said oral agreement—among other infirmities—was unauthorized in the first instance, and there is not even a microsopic scrap of evidence to show that it was ratified.

Defendant's exceptions to the first instruction given by the court on its own motion are well taken.

The instruction assumes that there was a preponderance of evidence, and does not instruct the jury what course to pursue in the event that the evidence was equally balanced.

The court failed to instruct the jury upon whom the burden of proof rested, or that the affirmative of all issues must be proved by the party maintaining the same by a preponderance of the evidence.

Said instruction is erroneous for the further reason that the jury were instructed, that "if any witness had wilfully sworn falsely as to any material matter it is

your duty to distrust the entire evidence of such witness."

It was error to instruct the jury that "it was their duty to distrust," instead of that "they were at liberty to distrust," such witness. (*State* v. *Burns,* 27 Nev. 289; *State* v. *Banks,* 5 South. 18; *State* v. *Baker,* 56 N. W. 425; *Cole* v. *Lake Shore & M. S. Ry. Co.,* 54 N. W. 638; *Trimble* v. *Territory,* 71 Pac. 932; *Church* v. *Chi. & A. Ry. Co.,* 23 S. W. 1056; *Hoge* v. *People,* 6 N. E. 796; Jones on Evidence, sec. 905, p. 1997, and cases cited.)

Said instruction should also have been qualified by the words, "except in so far as it is corroborated by other credible evidence." (*State* v. *Burns,* 27 Nev. 289; *State* v. *DeWolfe,* 74 Pac. 1086; *Cameron* v. *Wentworth,* 57 Pac. 648; *Hinkle* v. *State,* 21 S. E. 601.)

It is the duty of the court to instruct the jury upon every point presented by the issue. (*Hanchett* v. *Kimbark,* 2 N. E. 520; *First Nat. Bank.* v. *Carson,* 46 N. W. 276; *Marsh* v. *Cramer,* 27 Pac. 169; *Douglas* v. *McAllister,* 7 U. S. 298.)

The second instruction given by the court on its own motion does not correctly state the law and was error.

The jury were instructed that the plaintiff might pay for the ties delivered to him by the defendant under contract in cash, checks, or by an offset or cross-demand against the defendant.

A payment is the extinguishment of a debt, and is not in the nature of a set-off, which may be used or omitted as a defense at the pleasure of the defendant. (*Broughton* v. *McIntosh,* 1 Ala. 103; *Strong* v. *McConnell,* 10 Vt. 231.)

Mutual indebtedness does not work an extinguishment of the respective debts without the application of them to each other by the concurrent acts of the parties. (*Seitzingsen* v. *Alspack,* 4 Atl. 203; *Past* v. *Carmalt,* 37 Am. Dec. 484.)

Offsets and cross-demands are not payments, except by express agreement. (*McCurdy* v. *Middleton,* 82 Ala.

131, 2 South. 721; *City Savings Bank* v. *Stevens,* 15 N. Y. Supp. 139; *Ulsch* v. *Muller,* 9 N. E. 736; *Kennedy* v. *Davidson,* 33 S. E. 291; *Hill* v. *Austin,* 19 Ark. 230.)

If we admit that, under sections 3142 and 3143, Comp. Laws, a cross-demand would constitute payment, then only such cross-demands as would constitute a counter-claim as specified in said section 3142 could be set up as payment; and the jury should have been properly instructed as to what cross-demands would constitute payment.

The jury should have been instructed that no cross-demand arising upon contract would be valid against the defendant, unless such contract was in writing. (Comp. Laws, 981.)

Said instruction is erroneous and was misleading for the further reason that, in his second cause of action, plaintiff alleged that the sum of $332.67 was due from defendant to him for ties sold by him to defendant, and plaintiff was thereby precluded from claiming this sum also as payment to defendant upon ties delivered to him under the contract, as a set-off, cross-demand or otherwise.

In the second paragraph of said instruction the jury were instructed, that if the plaintiff was not indebted to the defendant on July 17, 1906, for ties theretofore delivered to him under said agreement, then it was their duty to find for the plaintiff, thereby making said indebtedness the only issue in the case and taking from the jury the consideration of all other issues therein.

A general verdict cannot be upheld where there are several issues tried, and upon any one of them error is committed in the admission or rejection of evidence, or in the charge of the court, because it may be found that the jury founded their verdict upon the very issue to which the erroneous ruling related, and that they were controlled in their finding by that ruling. (*What Cheer Coal Co.* v. *Johnson,* 56 Fed. 813; *Creswell Ranch and Cattle Co.* v. *Martindale,* 63 Fed. 90; *St. Louis I. M. & S. Ry. Co.* v. *Needham,* 63 Fed. 114; *Jas. Holmes Fuel and*

*Feed Co.* v. *Com. Nat. Bank,* 47 Pac. 289; *Maryland* v. *Baldwin,* 12 U. S. 490, 28 L. Ed. 822.)

The third instruction given by the court on its own motion is erroneous.  Said instruction was not made to apply to the specific ties referred to in the contract of sale, and undelivered on July 17, 1906.

Said instruction was as follows: "If you believe from the evidence that the plaintiff is entitled to recover damages in this case, then I charge you that the measure of such damages would be the difference, if any, between the cost price of such ties under the terms of said agreement, and the reasonable market value thereof at any time between July 17, 1906, and July 25, 1906, if you find from the evidence that the reasonable market value thereof, during said times, was greater than the cost price thereof under the terms of said agreement."

The instruction gives the measure of damages, as conceived by the court to be correct, but totally neglects to instruct the jury upon what particular ties this measure of damage is to be applied.  From a reading of the instruction it might well be supposed that the jury, in assessing the damages, included in such assessment all of the ties mentioned in the written contract of November 28, 1905, regardless of whether such ties had already been delivered to Henningsen or whether they were still undelivered.  The jury should manifestly have been instructed to base their damages upon only the ties which they should find from the evidence were still undelivered under the contract of November 28, 1905.  From the excessive verdict brought in, it looks very much as though the jury based their assessment upon all of the ties which the plaintiff attempted to prove were included under the terms of said contract of November 28, 1905. In no portion of the instructions given the jury are the jury instructed to confine their computation of damages to the ties mentioned in the contract of November 28, 1905, which had not yet been delivered to the plaintiff.

We have argued above that the alleged verbal contract, to sell ties to the railroad at 25 cents per tie, is a *nudum*

*pactum,* but if it has any legal force or effect whatsoever, we contend·that its operation is limited and defined by the rule laid down in *Pixley* v. *W. P. R. R. Co.,* 33 Cal. 198, and *Foulke* v. *San Diego R. R. Co.,* 51 Cal. 367, cited above.   Both cases pass on the statutory provision, "No contract shall be binding upon a railroad company unless made in writing."   (See Comp. Laws, 981.)

In *Pixley* v. *W. P. R. R. Co.,* it was held that the clause referred to executory and not to executed contracts, and that when a corporation takes and holds the benefit derived from the performance of a contract not in writing, it is liable to the extent of the benefit received.

In *Foulke* v. *San Diego, supra,* the court said: "The true rule to be deduced from the opinion in *Pixley* v. *Western Pacific Railroad Company* is that the provision of the statute must be limited to contracts wholly executory.   It cannot refer to those liabilities which the law itself implies from benefits received and actually enjoyed, where the services have been performed on the one side and received and enjoyed on the·other.   In the last class of cases, however, the action must be brought upon the implied promise, and the recovery must be limited to the value of the actual benefit received."

In view of the foregoing authorities and the rule laid down in these cases, it was gross error for the court to give the above instruction to the jury, of its own motion, said instruction being erroneous for the following reasons:

No recovery whatsoever for the ties mentioned in the second cause of action in plaintiff's complaint set forth, could be had, because said second cause of action alleges an express agreement to sell ties at the agreed prices of 25 cents and 50 cents each.   Since we have shown that the contract and agreement for such sale was oral, under the authorities cited *supra,* the only recovery which could be had by plaintiff would have been upon an implied contract for payment of the reasonable value of such ties.   Since the only liability (if indeed there was any liability) which rested upon the· defendant was an

implied liability to pay plaintiff the reasonable value of the ties mentioned in plaintiff's second cause of action, so sold to defendant by plaintiff, and since the plaintiff has declared upon and alleged an express contract in his said second cause of action, plaintiff. cannot recover anything upon said second cause of action, for the manifest reason that a plaintiff cannot recover upon an allegation of an express contract in his pleadings where the evidence shows an implied contract and nothing else. There would be a fatal variance between his allegations and proofs. (*Schirmer* v. *Drexler*, 134 Cal. 134.)

Therefore, the instruction just quoted was erroneous, for it unqualifiedly allowed and directed the jury to find damages against the defendant on plaintiff's second cause of action for such ties so sold and delivered.

A set-off may be used or omitted as a defense at the pleasure of the party in whose favor it exists. (*Broughton* v. *McIntosh*, 1 Ala. 103; *Past* v. *Carmalt*, 37 Am. Dec. 484; *Seitzinger* v. *Alspack*, 4 Atl. 203; *Strong* v. *McConnell*, 10 Vt. 231.)

A party has the right to have an instruction given in his own language if pertinent, unambiguous and correct in law. (*Jordan* v. *Benwood*, 42 W. Va. 312, 26 S. E. 266.)

When the burden of proof is on plaintiff, the jury. should be instructed that unless the evidence preponderates in plaintiff's favor, they should find for the defendant, and not to make up their verdict from a preponderance of the evidence. (*Gulf C. & S. F. Ry. Co.* v. *Fowler*, 34 N. W. 661.)

The jury should have been instructed that the burden of proof was on the plaintiff to establish his case by a preponderance of the evidence. (Brickwood Sackett Instructions, vol. 1, secs. 359, 360; *Illinois Cent. Ry. Co.* v. *Prickett*, 71 N. E. 437; *North Chicago St. Ry. Co.* v. *Boyd*, 40 N. E. 955; *Powell* v. *Georgia F. & A. Ry. Co.*, 49 S. E. 761; *Wells* v. *Houston*, 57 S. W. 589; *Chicago Union T. Co.* v. *Olsen*, 71 N. E. 985; *Howard* v. *Britton*, 9 S. W. 73; *DeHart* v. *Board of Com.*, 41 N. E. 825;

*Chicago City Ry. Co.* v. *Carroll,* 68 N. E. 1087; *John Ainsfield Co.* v. *Rassmusson,* 85 Pac. 1002.)

The jury should have been instructed that if the evidence was equally balanced their verdict should be for the defendant. (Brickwood Sackett Instructions, vol. 1, secs. 356, 361; *Allen-West Com. Co.* v. *Hudgens & Bro.,* 86 S. W. W. 291; *Wrigley, et al.* v. *Cornelius, et al.,* 44 N. E. 406; *Alton L. & T. Co.* v. *Oliver,* 119 Ill. App. 190; *Haywood* v. *Scott,* 141 Ill. App. 531.)

Defendant's instruction No. 2 contains a correct statement of the law upon preponderance of evidence, and should have been given. (Brickwood Sackett Instructions, vol. 1, sec. 353; *Pfaffenback* v. *L. S. & M. S. Ry. Co.* 41 N. E. 530; *Chicago Union T. Co.* v. *Yarmus,* 77 N. E. 1129.)

In the first instruction given by the court upon its own motion, the jury were instructed that, if the evidence is contradictory the decision must be made according to the preponderance of the evidence, but the jury were not told what was meant by a preponderance of the evidence; and for this reason defendant's instruction No. 2 should not have been given. (*Junction City* v. *Blades,* 41 Pac. 680.)

The jury should have been instructed to consider the opportunities of the respective witnesses for knowing the facts to which they testified, in determining their credibility, and the preponderance of the evidence. (*Jones* v. *Alabama Mineral Ry. Co.,* 18 South. 32, 33; *Louisville & N. Ry. Co.* v. *Ward,* 61 Fed. 931.)

The jury should have been instructed that any indebtedness claimed by plaintiff against defendant would not relieve or excuse him from paying for the ties delivered to him under the contract, and as specified therein.

Defendant presented six instructions on this point, presenting the law in different phases and language, all of which were refused.

Payment can only be made in money. (See cases cited *supra; Strong* v. *McConnell,* 10 Vt. 231; *Broughton* v. *McIntosh,* 1 Ala. 103.)

The jury should have been instructed that if plaintiff was guilty of a breach of the contract, the fact that the defendant thereafter delivered ties to him under said contract would not be a waiver of such breach. (*Gardner* v. *Clark,* 21 N. Y. 403; *Marky* v. *City of Milwaukee,* 45 N. W. 30; *Dunn* v. *Daly,* 78 Cal. 640; *Lowenfeld* v. *Curtis,* 72 Fed. 105.)

One of defendant's defenses to this action was that plaintiff had breached the contract by his failure to pay for the ties delivered to him thereunder prior to defendant's refusal to proceed further under the same, and defendant was thereby relieved from making any further deliveries; and defendant was entitled to have the jury properly instructed upon this issue. (*Bering Mfg. Co.* v. *Femelat,* 79 S. W. 873, and cases cited *supra.*)

The court erred, not only in instructing the jury, but also in refusing to give instructions requested by the defendant, and it cannot be said that the defendant was not prejudiced by such errors.

"It is only when there is no doubt what the result of another trial must be, no doubt that the error at the first trial created no prejudice, that an appellate court may disregard that error and affirm the judgment. The presumption always is that error produces prejudice, and the latest decisions of the supreme court rule that it must appear beyond doubt that the error did not prejudice, and could not have prejudiced, the party who complains of it, before a new trial can be lawfully denied." (*United States* v. *Price Trading Co.,* 109 Fed. 250.)

And to the same effect are *Mexia* v. *Oliver,* 148 U. S. 673, 37 L. Ed. 606; *Deery* v. *Cray,* 5 Wall. 807, 18 L. Ed. 657; *Gilmer* v. *Higley,* 110 U. S. 50, 28 L. Ed. 63; *Railroad Co.* v. *O'Brien,* 119 U. S. 103, 30 L. Ed. 299; *Brown* v. *Cranberry Iron and Coal Co.,* 72 Fed. 102; *National Masonic Acc. Assn.* v. *Shryock,* 73 Fed. 781; *Lyon, Potter & Co.* v. *First Nat. Bank,* 85 Fed. 125; *Durant M. Co.* v. *Percy Con. M. Co.,* 93 Fed. 169.)

In conclusion, and by way of recapitulation, we submit:
1. That the evidence was insufficient to sustain the

verdict. Henningsen owed the railroad company the sum of $6,540.66. The record shows that he fell far short of paying the debt, whether we limit him to the payments he might lawfully be entitled to claim or whether we concede to him every item of payment, credit and offset disclosed by the record. He was not entitled to a verdict under the instructions of the court.

2. The agreement of November 28, 1905, upon which the action was predicated, was not a corporate obligation and was not binding on the defendant.

3. The damages were excessive.

4. The instructions and rulings of the court were erroneous and prejudicial.

5. The judgment should be reversed with instructions to enter judgment for defendant.

*McIntosh & Cooke*, for Respondent.

By the Court, TALBOT, J. (after stating the facts as above):

In elaborate and carefully prepared briefs some propositions have been argued which are not deemed strictly applicable to this case. We will consider more particularly the contentions of appellant that the agreement of November 28, 1905, was not authorized by or binding upon the railroad company; that the evidence is insufficient to sustain the verdict, because it is asserted that Henningsen owed the railroad company, and consequently had forfeited the contract at the time the company sought to cancel it; that the damages were excessive; and that the instructions of the court were erroneous or prejudicial.

It does not appear that there was any resolution of the board of directors of the railroad company directing the sale of the ties, or ratifying the contract after sale. We need not speculate as to whether the general superintendent of a railroad as ordinarily officered and managed would have the right, under his usual powers, to sell discarded ties without special authority from the board of directors.

At a meeting in Philadelphia, Alonzo Tripp had been employed to come to Nevada and to build and operate the road. This building of the road consisted, in part, of broad-gaging that portion of it from which the narrow-gage ties in dispute were taken. The facts that some of the bills collectible, marked "Paid," were credited to broad-gaging on the forms of the company, bearing the printed direction that remittance be made to Alonzo Tripp, general superintendent, that one of them, signed by him, approved by the auditing officers, and receipted by the assistant treasurer, referred expressly to the contract, and the others were for ties at the contract price, and the other circumstances indicate that the ties were subject to disposition under the general powers he was exercising. He was the head officer, charged with the control and management of the road in the state where it was situated.

The power to build, broad-gage, and operate the road would seem to carry with it the authority to sell ties which were being discarded or removed as the road was being broad-gaged. As the ties were being stolen and burned, it was to the advantage of the company to have them sold, and we think that under the general authority given and conditions shown he could make a contract for the sale of the ties as binding as contracts made by him for the furnishing of new or broad-gage ties, or of fuel for the operation of trains, and that it was not necessary to have a special resolution of the board in Philadelphia for every transaction relating to the construction and operation of the road. The general authority of Tripp could be fairly implied to authorize him to conduct the ordinary operations and legitimate business of the road, within which would be included the disposition of narrow-gage ties taken out while he was broad-gaging the road. In this connection we distinguish and do not disagree with cases which have been cited where the conditions were different, and wherein it was held that officers of a company were not authorized to sell or mortgage real estate or other property not in line with the ordinary

business of the company without special authority from the board of directors.

If the execution of the contract had not been authorized in the first instance, the circumstances are such as to raise the presumption that it was ratified. When we consider that prior to the making out of the contract the president assented to the statement of Tripp that they ought to get rid of the narrow-gage ties; that this contract was drawn up by the regular attorneys for the company and turned over to the auditor; that deliveries of ties under it were made for about six or seven months after its execution under the direction and supervision of Tripp, the head officer of the company in control of its business in the state, of his successor, Hedden, and of the auditor, chief clerk, and assistant treasurer of the company; that bills collectible, showing the sale of the ties as per the contract and at the contract price, and the receipt of payments for them, on the blanks of the company, were made out and approved by these officials and filed in its accounting department; that Tripp notified Brock, the president of the company, by letter to the head office of the company in Philadelphia, of the execution of the contract soon after it was made, and a little later showed him the contract when he came to Tonopah—we must conclude that the company knew, or ought to have known, that the contract had been executed, that the ties were being delivered, and that money was being received for them. By the knowledge with which it was chargeable and the conduct of its various officers, and by its acts and acquiescence in these conditions during this long period, the company would have become bound by the contract if its execution had not been authorized.

In the case of *Edwards* v. *Carson Water Co.*, 21 Nev. 469, to which, with others, we have been cited, the facts were far from similar to the conditions in the present case, and a different principle of law applied. It was there sought to recover from the corporation on an obligation which had been originally due from the president of the company individually, but for which he had signed

a note as president of the company.   In that case this court said: "In the case of *Frenkel* v. *Hudson*, 82 Ala. 162, Somerville, J., in speaking of the general rule that the knowledge of the agent must be imputed to the principal, said: 'It has no application, however, to a case where the agent acts for himself, in his own interest, and adversely to that of the principal.   His adversary character and antagonistic interests take him out of the operation of the general rule, for two reasons: First, that he will very likely in such case act for himself, rather than for his principal; and, secondly, he will not be likely to communicate to the principal a fact which he is interested in concealing.   It would be both unjust and unreasonable to impute notice by mere construction under such circumstances, and such is the established rule of law upon this subject.'   (Mechem Ag., sec. 723; Ang. & A. Corp., secs. 308, 309.)"

Some of the cases make a distinction between ratification of an unauthorized act and such laches as will be held to estop from denying the granting of authority. (2 Morawetz, Corp., sec. 628.)

In *Kelsey* v. *Bank*, 69 Pa. 429, the court said: "The law is well settled that a principal who neglects promptly to disavow an act of his agent, by which the latter has transcended his authority, makes the act his own; and the maxim which makes ratification equivalent to a precedent authority is as much predicable of ratification by a corporation as it is of ratification by any other principal, and it is equally to be presumed from the absence of dissent."

In *Murray* v. *Lumber Co.*, 143 Mass. 250, 9 N. E. 634: "When the alleged principal is a corporation, a ratification may be shown by proving that the officers who had the power to authorize the act knew of it and adopted it as a valid act of the corporation, although no formal vote is passed by them."

In Morawetz on Corporations, secs. 630, 633, it is said: "The ratification by a corporation, acting through one of its agents, of an unauthorized act performed by an

inferior agent, may be shown in the same manner as a ratification by the company directly. Acquiescence is good evidence of consent, and if the agents of a corporation who have the power to ratify an unauthorized act performed by another agent manifest no dissent after full notice, a ratification of the act may often be presumed. In some instances a principal may be estopped from repudiating an unauthorized act, of which he had no actual knowledge; as where the principal ought by reason of the relation of the parties to have known of the act, and cannot in equity and good conscience set up his ignorance."

In *Olcott* v. *Tioga Railroad Co.*, 27 N. Y. 546, 84 Am. Dec. 298, where the question was whether the corporation had ratified the unauthorized act of the president in executing a bill of exchange, the court said: "But the subsequent rendering of accounts to the board of managers containing entries of such payments, unobjected to on the part of the board, affords a strong presumption of a ratification of those acts."

In *Conover* v. *Insurance Co.*, 1 N. Y. 290, 292, it was said: "And it is insisted that inasmuch as the board never by any formal act gave their sanction, and the by-laws required the consent in writing of the directors to any conditional alienation by mortgage subsequent to the insurance, the consent in this case was unauthorized and void. I cannot subscribe to this doctrine. The directors were bound to know the uniform course pursued by their sole agent in the transaction of their business at their office, especially where regular entries of his acts were made in their books; and they must be held responsible on the ground of a tacit assent and approval, unless they can show by a strict vigilance and scrutiny into his acts they were unable to ascertain the course he was pursuing, and could not, therefore, arrest it or put the public on their guard."

In *Union Gold Mining Co.* v. *Bank*, 96 U. S. 640, 24 L. Ed. 648, the president of the mining company was informed of the indebtedness incurred without authority by the general manager, and the company did not within

a reasonable time repudiate the act of the manager in borrowing the money. It was held that such notice to the president was notice to the company, and that the jury were authorized to conclude that the company had consented to what had been done in its name. In a concurring opinion it was said: "I grant that if, by such attention to its affairs as a man of ordinary prudence in the like case would have exercised, the corporation might have informed itself of Becker's doings, it is the same as if they had actual knowledge. The corporation ought not to be heard to say that it did not know that which by the ordinary diligence which the law exacts of them they might have known."

It is unnecessary to advert further to the numerous cases maintaining this legal principle. As the contract states that the company "is the owner of a quantity of narrow-gage ties heretofore used in the construction, maintenance, and operation of the line of railroad prior to standard-gaging the same," and provides for the sale of "all and singular the stock of narrow-gage ties now owned by the first party and distributed at various places along the line of the first party's railroad," and that the "agreement shall remain in force and effect until the first party has delivered to the second party all of the ties above mentioned," we conclude that the contract covers all the narrow-gage ties which the company removed in broad-gaging the track, or which it had on hand at the time the agreement was made.

It is not necessary to determine whether the narrow-gage ties which were not removed, and which were never intended to be removed, from the sidetracks or the main track, if all were not removed from the main track, were included in the agreement; for they are conceded to the appellant by the respondent, and therefore may be treated as a part of the track, instead of ties, within the meaning of the contract. It is not assumed that there was any intention to sell, or ratify the sale of, ties that were not to be removed from the track.

Appellant claims that the ties which were used by the

company in platforms, buildings, and bunkers were not intended to be included in the agreement; but the contract makes no exception in this regard. If, after making this contract, which reserves no ties for these purposes, the company could exempt any ties it desired or needed, it could have used all the ties for building or-other purposes, and thereby nullify the contract entirely, or at any time it desired after a part of the ties had been delivered. Hence the contract did not allow the company to make any such reservation, which, if contemplated or desired at the time of its execution, ought to have been made one of its terms. It bound Henningsen to take all ties, without reservation, within a reasonable time (9 Cyc. 611, b), and if the company had not desired to use any for its own purposes it could have required him to take all of them, and standing on the other side of the agreement he was entitled to have all of them.

It is urged that Henningsen breached the contract because he had not been paid for all the deliveries at the time Hedden, the general superintendent, wrote Henningsen, July 16, 1906, that he considered that by reason of nonpayment Henningsen had violated and abrogated the agreement. Many of the decisions are conflicting as to whether the refusal of a purchaser to make payment for each delivery is ground for the cancelation of a contract providing for other installments. This discrepancy in some of the authorities is more apparent than real, because the circumstances are so variant as to give good reasons for different conclusions. In addition to several cases cited by appellant, holding that a failure by one of the contracting parties to pay at a stipulated time gives the other the right to terminate the contract, many other decisions are found both supporting and opposing this view.

In *Ross-Meehan Foundry Co.* v. *Royer Wheel Co.*, 113 Tenn. 370, 83 S. W. 167, 68 L. R. A. 829, 3 Am. & Eng. Ann. Cas. 899, under a contract for the purchase of castings providing for delivery during the term of three years, the failure of the defendant to make payment for

castings delivered as provided by the contract was held to give the plaintiff the right to decline to make further deliveries. There was a delay of about nine months in making payment for the castings received, and complaint for failure to make payment for deliveries made. After quoting from section 1140 of Mechem on Sales, the court continued: "That author, after putting the question, 'Does the default of one party in delivering or paying one installment justify the other in treating the contract as at an end, or must the latter continue performance on his own part, relying on his action for damages to compensate him for the breach by the former?' proceeds then to discuss both English and American authorities. In summing up as to the English cases, he finds that the rule prevailing there is the one announced in the *Mersey Steel Case* (9 App. Cas. 434), before referred to. As to the American cases, in section 1148 he says, though not in harmony, 'that the view that the failure of either party to perform an essential term of the contract gives to the other the right to rescind that contract is sustained by the clear weight of American authority.' As enforcing this view the author refers to *Norrington v. Wright, supra* (115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366), *Pope v. Porter*, 102 N. Y. 366, 7 N. E. 304, and *McGrath v. Gegner*, 77 Md. 331, 26 Atl. 502, 39 Am. St. Rep. 415. *Pope v. Porter* was a case in which there was a contract for the delivery of iron in two installments, and the seller made default in the delivery of the first, but offered to deliver the second, which the buyer refused to accept. The court held that the first failure of the seller justified the refusal of the buyer. * * * The case of *McGrath v. Gegner, supra*, was where the same rule was applied in favor of the seller upon a default in payment by the buyer. The contract there repudiated was for the sale of a lot of shells to be delivered in weekly installments, each of which was to be paid for within a week following its delivery. The buyer made default, and the seller repudiated the contract. * * * This view is also supported by *Kokomo Strawboard Co. v. Inman*, 134 N. Y. 92, 31 N. E.

248; *Winchell v. Scott*, 114 N. Y. 640, 21 N. E. 1065; *George H. Hess Co.* v. *Dawson*, 149 Ill. 138, 36 N. E. 557; *Providence Coal Co.* v. *Coxe*, 19 R. I. 380, 382, 35 Atl. 210; *Rugg* v. *Moore*, 110 Pa. 236, 1 Atl. 320; *Branch* v. *Palmer*, 65 Ga. 210; *Baltimore* v. *Schaub*, 96 Md. 534, 54 Atl. 106. On the other hand, New Jersey, in *Blackburn* v. *Reilly*, 47 N. J. Law, 290, 1 Atl. 27, 54 Am. Rep. 159, and other cases; Michigan, in *West* v. *Bechtel*, 125 Mich. 144, 84 N.W. 69, 51 L. R. A. 791; and the United States Circuit Court of Appeals for the Sixth Circuit, in *Cherry Valley Iron Works* v. *Florence Iron River Co.*, 64 Fed. 569, 22 U. S. App. 655, 12 C. C. A. 306, and in *Monarch Cycle Mfg. Co.* v. *Royer Wheel Co.*, 105 Fed. 324, 44 C. C. A. 523—adopt the rule announced in *Mersey Steel Co.* v. *Naylor, supra*, while the Supreme Court of Iowa, in *Myer* v. *Wheeler*, 65 Iowa, 390, 21 N. W. 692, held that such a contract was divisible, and that rescission would not be allowed unless the breach went to the whole consideration."

In a note at 3 Am. & Eng. Cas. 901, it is said that under a contract for the continuing deliveries of goods, payment to be made at stipulated times for previous deliveries, the seller is not bound to continue delivery unless the purchaser is ready and willing to make payments as required by the contract, and reference is made to several cases. Further over the note proceeds: "In *Freeth* v. *Burr*, L. R. 9 C. P. 208, Chief Justice Coleridge held that the mere nonpayment for the first portion of goods contracted for, unattended by any other act on the part of the purchasers, does not put an end to the contract, so as to disentitle the purchasers to maintain an action for the nondelivery of the second portion. * * * . In *Midland R. Co.* v. *Ontario Rolling Mills*, 10 Ont. App. 677, the Ontario Court of Appeal said: 'The true test in such cases is the one laid down by Lord Coleridge in *Freeth* v. *Burr*, L. R. 9 C. P. 208, fully approved of in the House of Lords in the recent case of *Mersey Steel Co.* v. *Naylor*, 9 App. Cas. 434. The question is, as explained by Lord Justice Bowen in that case in the Court of Appeal, 9 Q. B. D. 648, not whether the conduct of one party to the

contract was inconsistent with the contract, but whether the conduct of one party to the contract was really inconsistent with an intention to be bound any longer by the contract. That must necessarily be a question of fact upon the evidence in each particular case.' "

In *Tucker* v. *Billing*, 3 Utah, 82, 5 Pac. 554, a contract for the sale of lumber provided that payment be made for 20,000 feet as often as 25,000 feet were delivered, and that the balance be paid at the end of the year. It was held that the failure to make one payment for lumber delivered was no excuse for the refusal of the seller to further deliver lumber according to the terms of the contract. The court said: "The parties undoubtedly could have made the payment of any installment a condition precedent to a future delivery, and the nonpayment of any such installment such a substantial violation of the contract as to authorize the other party to abandon it. But they have not; nor can it be inferred from the language used."

In *Monarch Cycle Manufacturing Co.* v. *Royer Wheel Co.*, 105 Fed. 324, 44 C. C. A. 523, it was held that a contract for the sale and purchase of 2,000 bicycles at specified prices, monthly shipments to be made as specified by the purchaser, was an entire contract; that the failure of the purchaser to pay for the deliveries made within the time stipulated was not a renunciation of the contract, which justified the seller in treating it as abandoned, or absolved him from his obligation to make further deliveries, in the absence of a provision therefor in the contract, unless there was a refusal by the purchaser to pay in such terms as indicated a purpose on his part to renounce the contract.

In *Hime* v. *Klasey*, 9 Ill. App. 166, it was held that, as the contract did not make a failure to pay for a preceding installment a condition precedent to the delivery of another, the vendor could not rescind the contract until there was a demand for payment and refusal.

In *Myer* v. *Wheeler*, 65 Iowa, 390, 21 N. W. 692, there was an agreement to sell ten carloads of barley, to be delivered from time to time. Upon the receipt of the

first carload the purchaser refused to pay for the same because it was not equal to the sample, but urged shipment of the remainder of the barley, and promised to pay for future shipments. The seller refused to ship any more unless payment was made for the first carload. It was held that the contract was severable, that the refusal to pay for the first carload did not entitle the seller to rescind and refuse to deliver the other carloads, that the seller was entitled to recover for the value of the carload delivered, and the purchaser to recover damages for the failure to deliver the other nine carloads.

In *Hansen* v. *Consumers' Steam Heating Co.*, 73 Iowa, 77, 34 N. W. 495, the plaintiff had agreed to furnish to defendant, at a specified price, all the coal it would need during the season, the coal furnished during any months to be paid for on the 10th of the following month. It was held that the plaintiff could not declare the contract at an end on the failure of the defendant to pay at the time agreed for the coal already delivered, and recover the market value instead of the contract price for coal delivered thereafter.

In *Blackburn* v. *Reilly*, 47 N. J. Law, 290, 1 Atl. 27, 54 Am. Rep. 159, it was held that, on a contract for the sale of goods by successive deliveries and payment, a default in respect to one or more of these will not discharge the other party, unless it is evident that the defaulting party no longer intends to fulfill the agreement. The contract provided for the sale of one car of bark weekly for a year, at $18 a ton, payable on delivery.

In *West* v. *Bechtel*, 125 Mich. 144, 84 N. W. 69, 51 L. R. A. 791, it was held that the refusal of the purchaser of wood to keep his agreement to pay for each shipment as received, while he insisted on the complete delivery of the wood, did not constitute such an abandonment of the contract on his part as would justify the seller in his refusal to ship any more wood. After reviewing a number of cases, the court said: "The Supreme Court of New Jersey takes the same view of this question. (*Trotter* v. *Heckscher*, 40 N. J. Eq. 612, 4 Atl. 83; *Blackburn* v. *Reilly*,

47 N. J. Law, 290, 1 Atl. 27, 54 Am. Rep. 159.)   In the latter case the English and American authorities were considered, and the rule adopted in the Mersey case was approved.   The court said: 'The rule to be applied in determining whether the express obligations of such contracts remain, after one or more breaches by either party, has been the subject of much discussion of late years, and has given rise to some contrariety of judicial opinion. * * * In our opinion the rule established in England by the judgment of the House of Lords in *Mersey Steel & I. Co.* v. *Naylor*, L. R. 9 App. Cas. 434, affirming the judgment of the Court of Appeal in L. R. 9 Q. B. Div. 648, is one which in ordinary contracts of this nature will work out results most conformable to reason and justice.   The rule is that defaults by one party in making particular payments or deliveries will not release the other party from his duty to make the other deliveries or payments stipulated in the contract, unless the conduct of the party in default be such as to evince an intention to abandon the contract, or a design no longer to be bound by its terms.   This rule leaves the party complaining of a breach to recover damages for his injury on the normal principle of compensation, without allowing him the abnormal advantage that might inure to him from an option to rescind the bargain. * * * It, of course, is inapplicable where the parties have expressed their intention to make performance of a stipulation touching a part of the bargain a condition precedent to the continuing obligation of the contract; and peculiar cases might arise where the courts would infer such an intention from the nature and circumstances of the bargain itself—cases in which the courts would see that the partial stipulation was so important, so went to the root of the matter (to use a phrase of Blackburn, J., in *Poussard* v. *Spiers*, L. R. 1 Q. B. Div. 410), as to make its performance a condition of the obligation to proceed in the contract.'   In New York the question was considered in the case of *Cahen* v. *Platt*, 69 N. Y. 348, 25 Am. Rep. 203, and it was held that a delivery of one invoice of glass that was inferior to that

contracted did not justify the purchaser in refusing to take subsequent consignments of glass corresponding with the requirements of the contract. See, also, *Ebling* v. *Bauer*, 17 N. Y. Week. Dig. 497; *Selby* v. *Hutchinson*, 9 Ill. 319; *Bloomington Electric Light Co.* v. *Radbourn*, 56 Ill. App. 165; *Gatlin* v. *Wilcox*, 26 Ark. 309. The case of *Meyer* v. *Wheeler*, 65 Iowa, 390, 21 N. W. 692, is closely analogous to the present case. Plaintiffs sold defendants ten carloads of barley. Defendants were to pay 75 cents per bushel for each carload, when delivered. On receipt of the first carload the defendants refused to pay upon the ground that the barley was not equal to the sample, but stated that they had given plaintiffs credit for 65 cents per bushel and would withhold payment until the ten carloads were delivered, and urged shipment of the remainder. It was held that this did not entitle the plaintiff to rescind the contract, and that he was liable for damages resulting from nondelivery of the remainder. See, also, *Burge* v. *Cedar Rapids & M. River R. Co.*, 32 Iowa, 101. A valuable note upon this subject will be found in *Lake Shore & M. S. R. Co.* v. *Richards* (Ill.) 30 L. R. A. 33. The authorities are reviewed in *Norrington* v. *Wright*, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366, though the exact question before us was not involved. An interesting note upon that case at circuit will be found in 21 Am. Law Reg. (N. S.) 395, where the authorities, English and American, are collected. In 2 Benjamin, Sales, 909, the author says that 'In America the law appears to be fairly settled, in accordance with the case of *Simpson* v. *Crippen*, L. R. 8 Q. B. 14, viz, that in the absence of any expressed intention of the parties a contract for the sale of goods by successive deliveries is severable, and the failure to accept or deliver one installment does not entitle the other party to refuse delivery or acceptance of the installments that remain.' Only one case, *King Philip Mills* v. *Slater*, 12 R. I. 82, 34 Am. Rep. 603, has been found, in which the rule laid down in *Simpson* v. *Crippen* is directly attacked. The editor of American Notes to the fourth edition takes issue with

Mr. Benjamin; but we think his views are not as well
supported by the authorities as the review of *Norrington*
v. *Wright,* by Mr. Landreth.   See, also, Clark, Contr. 652,
*et seq., Lee* v. *J. B. Sickles Saddlery Co.,* 37 Mo. App. 201,
and 1 Beach Modern Law of Contracts, 122, 123, 849, and
notes."

Some of the cases which require the strictest perform-
ance to avoid forfeiture relate to ordinary commercial
transactions, and are based on the theory that prompt-
ness is for the protection of trade.   A careful reading of
the opinion in *Norrington* v. *Wright,* 115 U. S. 188, 6 Sup.
Ct. 12, 29 L. Ed. 366, indicates that the Supreme Court of
the United States considered mercantile contracts provid-
ing for separate deliveries in a class by themselves, and
distinguished between the failure of the seller to deliver
and the purchaser to pay.   The language of the decision
reconciles the conclusion in that case, that the failure of
the seller to deliver according to the agreement allowed
the purchaser to rescind, with the judgment affirmed by
the House of Lords in *Mersey Co.* v. *Naylor,* 9 App. Cas.
434, holding that the failure of the buyer to pay for the
first installment upon delivery did not entitle the seller
to rescind and to decline to make further deliveries
unless the circumstances evinced an intention on the
delinquent buyer's part to be no longer bound by the
contract.   In *Norrington* v. *Wright,* the court said: "And
the grounds of the decision, as stated by Lord Chancellor
Selbourne in moving judgment in the House of Lords,
are applicable only to the case of a failure of the buyer
to pay for, and not to that of a failure of the seller to
deliver, the first installment.   In the contract of mer-
chants, time is of the essence.   The time of shipment is the
usual and convenient means of fixing the probable time
of arrival, with a view of providing funds to pay for the
goods, or of fulfilling contracts with third persons."

Uncertainty has arisen by reason of the failure of some
of the courts and text-writers to recognize the distinc-
tion made in *Norrington* v. *Wright,* and by the unwar-
ranted conclusion that the decision in that case promul-

gated a rule in this country contrary to the one in *Mersey Co. v. Naylor*. In view of the sharp conflict in the opinions of the eminent courts and leading text-writers, as indicated, and the circumstances of this case, we do not deem it necessary to determine whether ordinarily the failure to pay upon demand or statement rendered for one or more installments of goods or personal property delivered under a contract of the character of the one on which this action is based is sufficient ground for the cancellation of the agreement. Nor is it essential in reaching a conclusion to consider whether Henningsen in fact owed the appellant at the time it was sought to forfeit the contract; for not only have many of the courts held, as we have seen, that failure to pay for an installment will not necessarily work a forfeiture of the contract, but in this case prompt payment was waived. If appellant be given the benefit of the doubt, and it be conceded for the argument that respondent breached the contract by failing to pay for the ties at the time the deliveries were made, the appellant by its own delay and conduct lost the right to rescind.

The letter or notice to Henningsen, claiming that he had forfeited the contract by nonpayment and that the company was no longer bound by it, was based on the assertion that he was owing the company about $900. In the final argument in this court the attorney for the appellant admits that two checks had been paid by Henningsen, amounting to about $1,200, which had been lost, which were not credited on the books of the company, and regarding which Hedden probably was not informed. When sending the notice he may have believed that the contract was forfeitable because payment had not been made at the time of deliveries; but he may have been prompted to send it more by the notice given by Henningsen a short time before that he would hold the company to account for ties it was using or selling than by any anxiety for payment. Henningsen was claiming that the company was owing him, and it does not appear that there was any intention on his part to

make default on any payment which he believed to be due at the time the company sought to cancel the agreement. The notice contained no statement or demand for the price of any specified number of ties or definite amount of money, and no warning to Henningsen that he would not be supplied with more ties, as he had demanded, unless he paid for them on delivery, or paid for previous deliveries, and no demand for any payment as a condition precedent for making further deliveries. He would write at different times for a certain number of cars to be delivered at Tonopah or Goldfield, and they would be forwarded and delivered without any strict system of rendering statements or making collections. Under the terms of the contract the company was entitled to have payment made upon delivery, and was not required to make any deliveries without payment; but by making deliveries without rendering statements or demanding payment at the time deliveries were made, and by accepting payment later, the company waived payment at the time of making these deliveries. The transactions of the parties and the delays in settlements and payments which had been acquiesced in by the appellant led to dispute regarding the condition of the accounts.

By failure to collect for the ties at the times they were delivered, by accepting payments at varying times later and continuing to make deliveries, by failing to present bills collectible, other than those for which payments were made and accepted, before notice of forfeiture, the company allowed the delay in making payments to grow into a practice, until there was uncertainty regarding any balance due, and it was not justified in trying to cancel the contract at the time the notice claiming forfeiture was given, without at least first presenting a statement of the amount claimed, or making some demand and giving Henningsen an opportunity to pay. If appellant had exacted or demanded payment at the time of each delivery, and respondent had failed to pay, appellant would not have been obligated to make further

deliveries without payment being made for them at the time of delivery.

In *Eaves* v. *Cherokee Iron Co.*, 73 Ga. 459, there was a contract for the sale of 20,000 tons of iron ore, to be furnished at the rate of fifty tons per day, and it was held that when a contract is in writing each party has the right to expect the other to do exactly what he promises; but if, in the course of its execution, some of its terms are departed from, and money is paid and received on that departure for some time, then before one of the parties can recover from the other for failure to pursue the letter of the agreement he must notify him with clearness of his purpose henceforth to stand on the original contract; that indefinite complaint is not sufficient, and that until there is distinct and emphatic notice that thenceforth the contract will be strictly enforced the departure is a sort of a new agreement.   (2 Wharton on Contracts, 870, note.)

Mr. Parsons, in his work on Contracts (vol. 2, p. 835, 9th ed.) says: "It is a general rule that a party, having a right of rescission because of the fault or act of the other, should make known his rescission, as soon as may be after he knows his right to rescind."

In *Byrne Mill Co.* v. *Robertson*, 149 Ala. 273, 42 South. 1008, it is said that the right of a seller to terminate a contract of sale upon the refusal of the purchaser to perform by payment for goods already delivered may be waived by words or by conduct.

In *Upton* v. *Sturbridge Cotton Mills*, 111 Mass. 446, it was held that the delivery, apparently unrestricted, of goods sold for cash, was a waiver of the condition that payment must be made before the passing of the property, although the seller had an undisclosed intent not to waive condition.

In *Hebron Mfg. Co.* v. *Powell Knitting Co.*, 171 Fed. 817, 96 C. C. A. 489, in a decision rendered after the case before us had reached this court, it was held that where, under a contract for the sale of yarn, to be delivered in weekly shipments, the purchaser made payments semimonthly,

instead of ten days after each bill of lading, as required by the contract, and such payments were accepted by the seller and shipments continued, the seller could not cancel the contract because of such deviation from its terms, without reasonable notice to the purchaser. The court quoted with approval language from the opinions in *Portland Ice Company* v. *Conner*, 32 Pa. Super. Ct. 428, and *Forsyth* v. *Oil Company*, 53 Pa. 168; the language holding that where the parties have not exacted strict compliance with the conditions of the contract, or required prompt payment, lack of which was alleged as a ground for rescission, and liberal indulgence has been allowed, the contract cannot be suddenly rescinded without fair warning or such reasonable notice as would afford the other party an opportunity to adapt himself to the new situation.

In *Southern Car Mfg. Co.* v. *Scullin*, 38 Tex. Civ. App. 112, 85 S. W. 845, it was held that the fact that the purchaser in a contract for sale had not paid the seller for goods previously sold did not authorize the seller to rescind the contract.

In *Martin* v. *Wirts*, 11 Ill. App. 568, it was held that where there is an absolute and unconditional delivery of goods sold, without exacting performance of any condition precedent, the vendor will be presumed to have abandoned the security he had provided, and to have elected to trust to the personal security of the vendee.

In *Smith* v. *Lynes*, 5 N. Y. 41, it is said that where goods sold, to be paid for on delivery by notes, are delivered to the purchaser without notes being given or demanded, the presumption is the condition is waived.

In *Little Rock Cooperage Co.* v. *Lanier*, 83 Ark. 553, 104 S. W. 222, the court said: "This testimony shows conclusively that the idea of a forfeiture for failure to pay promptly was not entertained at the time of such failure, but was an after-conception. Appellees should have been ingenuous and candid with appellant, and should have notified it, at the time of these alleged breaches, that they intended to insist upon them as forfeitures. Not having done so then, they cannot do so now."

In *United States Iron Co.* v. *Sloss,* 71 N. J. Law, 1, 58 Atl.
173, it was said that a single shortage was not ground for
the rescission of the contract by the buyer after accept-
ance of subsequent shipments of the quantity stated in
the contract.

In *Wolfert* v. *Ice Co.*, 195 N. Y. 118, 88 N. E. 24, 21 L. R. A.
(N. S.) 864, it was held that the acceptance, by one who
has contracted for ice to be delivered from day to day
in such quantities as he may designate, of less than the
quantity designated on a particular day, will prevent his
rescission of the contract for refusal to deliver the entire
amount of installment.

. In *McDonald* v. *Kansas City Bolt Co.*, 149 Fed. 360, 79
C. C. A. 298, 8 L. R. A. (N. S.) 1110, it was held that, in
an entire contract for successive deliveries of goods sold,
a vendor's breach in the early deliveries may relieve the
vendee from liability for subsequent deliveries, if prompt
notice of refusal to perform is given, and that upon the
discovery of the vendor's breach the vendee has the
option to perform or to refuse to perform the remainder
of the contract; but silence, delay, or the failure to give
immediate notice of his choice to refuse is a choice to
perform and obligates him to comply with the contract.
At 8 L. R. A. (N. S.) 1110, the following appears in the
note: "The rule stated in the case in hand, requiring a
vendee under a continuing contract to give immediate
notice of his intention to terminate the contract because
of a breach as to preceding deliveries, is apparently
resultant from the well-established doctrine that a party
seeking to rescind a contract because of defective per-
formance by the other party must act promptly, and that
such defects are deemed waived when objection is not
made within a reasonable time.  In *Norrington* v. *Wright*,
115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366, in holding that
the purchaser of a quantity of iron rails, to be shipped in
certain proportions monthly, was justified in rescinding the
whole contract because of the vendor's failure to ship the
required number of tons in the first two installments, the
court attached the proviso that the right of rescission must

be distinctly and seasonably asserted; and it was further held that there was a seasonable. assertion of the right where notice of rescission was given as soon as the purchaser knew that the quantities theretofore received were less than the contract called for. In *Clark* v. *Wheeling Steel Works*, 3 C. C. A. 600, 3 U. S. App. 358, 53 Fed. 494, an instruction that any right which the purchaser might have had to rescind a contract for the purchase of a quantity of. steel slabs and billets, to be delivered in fixed installments, on account of defects in earlier installments, was lost if the jury should find that there was an unreasonable delay in asserting it, was approved. * * * In *Johnson* v. *Allen*, 78 Ala. 387, 56 Am. Rep. 34, it was said that the delivery of only a part of the quantity ordered, or a failure to deliver any part of it, does not terminate a contract for successive deliveries, unless the purchaser sees proper so to treat and regard it. In *Miller* v. *Moore*, 83 Ga. 684, 10 S. E. 360, 6 L. R. A. 374, 20 Am. St. Rep. 329, it was held that a defect of quality in certain carloads of grain, which were accepted and paid for, would not justify the purchaser of a number of cars of grain in bulk in rejecting other carloads subsequently tendered which were according to contract, where neither of the parties elected or intended to rescind or abandon the contract in whole or in part, and that such party might be held liable for the damages resulting from his failure to accept. In *Guernsey* v. *West Coast Lumber Co.*, 87 Cal. 249, 25 Pac. 414, it was held that where the purchaser accepted and paid for lumber delivered under a continuing contract to buy all the lumber of good merchantable quality which should be manufactured at a certain mill, without reserving the right to object to it subsequently, any ground of objection to it which might have existed would not justify a refusal to accept subsequent lumber which was in accordance with the contract. In *Moran* v. *Wagner*, 28 App. D. C. 317, it was held that the proviso that a purchaser must act with due diligence is attached to his right to rescind a contract for the sale and purchase of a quantity of oats, to be shipped from time to time,

because a shipment was not of the specified quality. In *McFadden v. Wetherbee*, 63 Mich. 390, 29 N. W. 881, it was held that defects in wooden blocks, delivered under a continuing contract, which were accepted and paid for, although complaint was made of their being defective, will not authorize the rejection and nonacceptance of blocks thereafter to be delivered under the contract, without a showing that the blocks so to be delivered were also defective. In *United States Iron Co. v. Sloss-Sheffield Co.*, 71 N. J. Law, 1, 58 Atl. 173, it was said, *obiter*, that a single shortage in a delivery under a contract cannot be taken advantage of by a purchaser as a ground for terminating the contract after acceptance of subsequent shipments of the quantity called for by the contract. In *Morgan v. McKee*, 77 Pa. 228, it was held that, where the vendor's failure to make one of the deliveries called for by the contract gives the vendee the right to rescind, such right must be exercised without unreasonable delay, and that, where notice of intention to rescind was not given until the next delivery was due and tendered by the vendor, the delay was unreasonable, and should be construed as an election to treat the contract as still subsisting. And in *Scott v. Kittanning Coal Co.*, 89 Pa. 231, 33 Am. Rep. 753, it was held that, where a purchaser did not inform the vendor that he would receive no more coal because previous deliveries were of an inferior quality, a failure to give orders for delivery of the balance under the contract rendered the purchaser liable in an action for damages for breach of contract."

Respondent has cited cases holding that whether there was a waiver is a question of fact for the jury; but where the circumstances are admitted, or clearly established, waiver becomes a question of law. (29 Am. & Eng. Ency. Law, 1108.)

In the brief, strong argument is made that the damages are excessive; but we do not understand that the appellant is seriously objecting to the final calculations made by respondent at the close of the argument, which show that the respondent sustained damage by failure to have

the ties delivered as provided in the contract and incidental loss to the woodyards, which had been equipped for sawing and handling ties, at least to the amount of the verdict.  In these calculations respondent charges for 108,345 ties which had been counted, and deducts and allows the appellant 16,345 ties in platforms, buildings, bunkers, and sidings, and in addition in one calculation allows appellant's claim of one-quarter of the remaining 92,000 ties as being under the main track, and in another calculation allows to appellant 10 per cent of the remaining 92,000 ties as being under the main track, according to the testimony of the witness White.

In two respects these calculations are too liberal to appellant, for, as we have seen, the appellant was entitled to retain only the narrow-gage ties which remained in the track, and the contract did not reserve to the appellant any which were put in the platforms, buildings, or bunkers after it was executed, and the respondent was entitled to these or to their value for mining timbers and wood, less 18 cents, the price which he was to pay for them, and because most of the ties allowed to the appellant as being under the track, according to the witness White, or a large part of them in the estimate allowing one-quarter, as claimed by the appellant, were in the sidings, which had already been allowed to the appellant once in the deduction of 16,345 for the platforms, buildings, bunkers, and sidings.  In this way the appellant was allowed in the calculations the benefit, not only once, but twice, of a considerable number of ties to which it was not entitled at all, and consequently the evidence would support even a larger verdict.  A discrepancy in the amount claimed by appellant for ties delivered to Henningsen seems to arise from charging him with 36,337 ties, when he had given the appellant credit for that number, but had charged back to the appellant 10,270 of these as being received by the Tonopah Mining Company and never going to Henningsen.

Appellant is contending, on various grounds, that if any agreement was made, as testified to by Henningsen,

that after he went to the Tonopah Mining Company to sell ties, Tripp told him that there had been a misunderstanding, that the mining company had placed an order for ties before the signing of the contract, and that Henningsen and Tripp finally agreed that ties which were taken to the mining company were to be delivered, and that Henningsen was to be allowed 25 cents apiece, and that appellant had settled with him for these at that price, it cannot be enforced. And appellant is also claiming that this agreement is so binding that the respondent had no right to raise the price to 50 cents by serving the notice that he would charge that amount for them after a specified date.

Respondent contends that no proper exception was taken in the district court in relation to this agreement. The contentions of counsel in regard to it relate principally to the question, which we have held need not be determined, as to whether Henningsen was owing the company at the time it sought to have the contract forfeited. Under the circumstances, this ageeement was favorable to the appellant, for it reduces Henningsen's claim on the ties used under it for timbers by the mining company to 25 cents, a. net profit of 7 cents to him, when the evidence indicates that these ties were worth 45 or 50 cents apiece, or that, if there had been no agreement to deliver them to the mining company for 25 cents, they would have yielded a profit of about 32 cents to Henningsen, if they had been delivered to him in compliance with the original contract. If the agreement was effective, it related to ties which had been ordered by the mining company, or were in course of delivery at the time it was made, and to ties delivered to the mining company later, and before there was any notice of an advance in price.

It does not appear that beyond these the agreement designated any further number of ties to be delivered at that price to the mining company, so that Henningsen would have been precluded from enforcing a charge of 50 cents after notice, if he were really damaged to that extent. After the sale of the narrow-gage ties to Hen-

ningsen under the original contract, and the making of
the agreement between him and Tripp, if one was made,
by which Henningsen was to receive 25 cents for the ties
which had been ordered by the mining company, it was
not incumbent on Henningsen to let the mining company
have ties at that price without limit as to time or num-
ber, when no definite number or period to cover further
orders from or deliveries to the mining company had
been agreed upon.

Exception is taken to several instructions, which need
not be reviewed in detail, because the controlling facts
are admitted, and error in these, if any, could not have
prejudiced the appellant or changed the result.  We con-
sider only one, as being illustrative of the bearing these
instructions have.    If it be conceded that, as claimed,
it was error for the court to instruct the jury that "it
was their duty to distrust," instead of that "they were
at liberty to distrust," the entire evidence of any wit-
ness who had wilfully sworn falsely to any material mat-
ter, and that the jury applied this instruction to the
witness or testimony introduced on behalf of appellant,
this would not have resulted in a more favorable verdict
to the company, when the material facts are admitted,
excepting possibly that one relating to the 25-cent con-
tract, in regard to which, if the jury did not believe the
testimony of the appellant, their conclusion would be
less favorable to the appellant, because under the other
admitted facts Henningsen would be entitled to more, or
about 50 cents apiece, less the contract price of 18 cents,
for the ties used by the mining company, or their value
as mining timbers, instead of to the reduced amount of
25 cents, less 18 cents, according to the agreement to
which he testified.

Under the views we have expressed, it is not necessary
to determine whether the contract is an executory one,
as claimed.   Nor need we consider whether Henningsen
refused to make payment for ties after demand, when he
believed the appellant was owing him for the construction
of an auto house which had in fact been built by a sepa-

rate company operating on the appellant's track, for, by accepting belated payments and continuing to make deliveries, the company had waived the right to cancel the contract without giving notice that prompt payment would thereafter be exacted in accordance with its terms.

The judgment of the district court is affirmed.

### ON PETITION FOR REHEARING

By the Court, SWEENEY, C. J.:

The petition for rehearing in the within-entitled case is herewith denied.

TALBOT, J., I concur.

NORCROSS, J., dissenting:

This case presents a number of serious and difficult questions of law. As some doubt exists in my mind as to the correctness of the decision rendered, I favor a rehearing, and for that reason dissent from the order denying the same.